# REDACTED OPINION

# In the United States Court of Federal Claims

**No. 16-98C**
**Redacted Version Issued for Publication: May 10, 2016[1]**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| PRICEWATERHOUSECOOPERS PUBLIC SECTOR, LLP, | \* \* \* \* |
| Protestor, | \* \* \* |
| v. | \* \* |
| UNITED STATES, | \* \* \* |
| Defendant, | \* \* |
| CALIBRE SYSTEMS, INC./ERNST & YOUNG, | \* \* \* |
| Defendant-Intervenor, | \* \* |
| BOOZ ALLEN HAMILTON, INC., | \* \* |
| Defendant-Intervenor, | \* \* |
| and | \* \* |
| DELOITTE CONSULTING, LLP, | \* \* |
| Defendant-Intervenor. | \* \* \* |

**Pre-Award Bid Protest; Corrective Action; 48 C.F.R. § 8.405; Injunctive Relief; Subject Matter Jurisdiction; Federal Acquisition Streamlining Act, 10 U.S.C. § 2304c(e); Organizational Conflicts of Interest; Unequal Treatment.**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Sharon L. Larkin**, Steptoe & Johnson, LLP, Washington, DC for protestor PricewaterhouseCoopers Public Sector, LLP.

**Domenique G. Kirchner**, Senior Trial Attorney, Commercial Litigation Branch, Department of Justice, Washington, DC for defendant. With her were **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division**, Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Douglas K. Mickle**, Assistant Director,

---

[1] This opinion was issued under seal on February 29, 2016. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the following notation: "[redacted]."

Commercial Litigation Branch, Department of Justice, Washington, D.C. Of counsel was **David Hurt**, Assistant General Counsel, Department of Defense Health Agency.

**Craig A. Holman**, Arnold & Porter, LLP, Washington, DC for defendant-intervenor CALIBRE Systems, Inc./Ernst & Young LLP.  With him were **Stuart W. Turner**, of counsel, Arnold & Porter, LLP, **Lauren J. Schlanger**, of counsel, Arnold & Porter, LLP, **Sonia Tabriz**, of counsel, Arnold & Porter, LLP, **Nathaniel E. Castellano**, of counsel, Arnold & Porter, LLP, **Amanda Johnson**, of counsel, Arnold & Porter, LLP for defendant-intervenor Ernst & Young LLP.  Also with him were **Brian Darst**, Odin, Feldman & Pittleman, P.C., and **Matthew Keller**, Odin, Feldman & Pittleman, P.C. for defendant-intervenor CALIBRE Systems, Inc./ Ernst & Young LLP.

**Kevin C. Dwyer**, Jenner & Block, LLP, Washington, DC for defendant-intervenor Booz Allen Hamilton, Inc.  With him were **Daniel E. Chudd**, of counsel, Jenner & Block, LLP, **Kathy C. Weinberg**, of counsel, Jenner & Block, LLP, and **Rachel K. Plymale**, of counsel, Jenner & Block, LLP.

**Keith R. Szeliga**, Sheppard Mullin Richter & Hampton, LLP, Washington, DC for defendant-intervenor Deloitte Consulting, LLP.  With him here **Jonathan S. Aronie**, Sheppard Mullin Richter & Hampton, LLP, **Katie A. Calogero**, Sheppard Mullin Richter & Hampton, LLP, and **Matthew W. Turetzky**, Sheppard Mullin Richter & Hampton, LLP.


**O P I N I O N**

<u>**HORN, J.**</u>

**FINDINGS OF FACT**

Protestor, PricewaterhouseCoopers Public Sector, LLP (PwC), filed a pre-award bid protest on January 19, 2016 to challenge the issuance of a revised solicitation by the Department of Defense, Defense Health Agency (DHA), which came after a decision by the Government Accountability Office (GAO), on November 16, 2015, to sustain an earlier, related bid protest challenging the award of a contract to PwC.  See <u>Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc.</u>, B-411884.6, 2015 WL 9701026, at *2 (Comp. Gen. Nov. 16, 2015).  At the same time the pre-award bid protest was filed, PwC also moved for a temporary restraining order and/or a preliminary injunction. PwC seeks to enjoin DHA from resoliciting quotes, evaluating those quotes, and making a new award under the amended Request for Quotations (RFQ) No. HT0011-15-T-0022, which DHA issued on December 21, 2015.  PwC alleges that:

> After a proper competition conducted pursuant to Federal Acquisition Regulation (FAR) Part 8, PwC won the competition fair and square, it rightfully received the order, and it is entitled to perform the order.  That order is now in jeopardy due to DHA's irrational and unlawful actions, which are the subject of this protest.

The protestor asserts three grounds in its bid protest:

(1) DHA's corrective action is irrational because it is being taken in response to a GAO decision that, itself, is irrational and contrary to controlling law; (2) even if the GAO's decision were correct, which it is not, DHA's corrective action is unlawful because it is far broader than is necessary to correct the GAO's identified procurement errors, it includes changes to the evaluation scheme that do not result from any changes in agency needs, it unfairly favors PwC's competitors, and it is competitively harmful to PwC whose quote information has been disclosed to PwC's competitors; and (3) the corrective action mandates that certain competitors of PwC be disqualified due to significant organizational conflicts of interest (OCI[s]).

The procurement in the above-captioned protest began on May 29, 2015, when DHA issued an RFQ "on behalf of the DHA, Healthcare Operation (HCO) Directorate." The acquisition plan for this procurement explained that in 2014 the Secretary of the Department of Defense ordered a 90-day review of the Military Health System (MHS), focused on access to care, safety, and the quality of care. The review was conducted by an "Action Officer (AO) Working Group," with contractor support, and resulted in a final report that "included six overarching recommendations; 77 recommendations related to access to care, quality of care, and patient safety; and 82 associated action items." Following the review, another working group was established to "develop specific plans to address the recommendations and associated action items contained in the Final Report." According to the declaration of Colonel Pehrson, the Government Lead for the MHS Review Project Management Office, which was submitted to the court following the filing of this bid protest, the working group submitted a plan to the Secretary of Defense "outlining 41 action plans and 264 milestones to address the findings in the MHS Review as well as the Secretary's guidance to implement changes necessary to become a top-performing health system."

The protestor alleges that this working group created a document titled: "MHS 90-Day Review Follow-On: Integrated Deliverable for 30 December 2014 Products." Action plan 1, of the 41 proposed by the follow-on working group, resulted in the establishment of the High Reliability Organization Task Force (HRO TF) in December 2014, which had "dual responsibilities to develop a framework for the Military Health System to become a high reliability organization[2] and for tracking and advancing closure of the action plans created in response to the MHS Review." According to the protestor, the HRO Task Force

---

[2] The MHS Review Final Report was attached by the protestor to the complaint filed in the above-captioned protest. The MHS Review Final Report explains that a high reliability organization is one in which "harm prevention and quality improvement are second nature to all in the organization. Such organizations recognize the risk of over simplification in complex systems: thus, implementation of the proposed recommendations should not be expected to result in immediate change."

published "The [HRO] Task Force Report: A Resource Guide for Achieving High Reliability in the Military Health System." (brackets in original).  Later, in January 2015, "the MHS Review PMO [Project Management Office] was established to facilitate tracking of the MHS Review action plans."  Based on the declaration of the Government Lead for the MHS Review Project Management Office, it appears that, as of the date of this decision, the MHS Review PMO continues to receive contractor support from Deloitte LLP, including assistance in tracking milestone progress.

Through the solicitation released on May 29, 2015, DHA intended to award a contract "to establish a Program Integration Office (PIO)" to "provide services necessary to transform the Military Health System (MHS) into a High Reliability Organization."  The RFQ issued on May 29, 2015 explained that the services to be performed under the contract would include:

> [E]stablishing and maintaining a comprehensive Program Integration Office (PIO), supporting full execution and implementation of action plans resulting from the MHS review, establishing an Enterprise Performance Management System, and providing direct support for each of the Services (Army, Air Force, and Navy) Medical Departments as described in the Performance Work Statement (PWS).

The contractor would be required to:

> [F]urnish the necessary personnel, materials, facilities, and other services as may be required to assist the Assistant Secretary of Defense (Health Affairs), the Defense Health Agency's Healthcare Operations Directorate and all of its associated Divisions in the support of action plans resulting from the MHS Review to provide a comprehensive Program Integration Office which supports robust performance management and continuous process improvement for the Military Health System to improve patient safety, access, and healthcare quality throughout the Military Health System Enterprise and all the various functions identified in the Scope of Performance Work Statement.

Pursuant to FAR subpart 8.405-3, 48 C.F.R. § 8.405-3 (2016),[3] DHA issued the RFQ to contractors that held the General Services Administration Performance Management/Continuous Process Improvement Blanket Purchase Agreement (GSA PM/CPI BPA), which was created under the Mission Oriented Business Integrated Services (MOBIS) Federal Supply Schedule (also known as Schedule 874).[4] PwC and

---

[3] The court reviewed the version of 48 C.F.R. § 8.405-3 issued in 2015, which was in effect at the time DHA issued the RFQ, and found no relevant differences between that version and the current version of the regulation.

[4] As a result of GSA's recent streamlining efforts, GSA has consolidated its Professional Services Multiple Award Schedule offerings, including the former MOBIS Federal Supply Schedule contract (Schedule 874), into one Professional Services Schedule.  See

defendant-intervenors Booz Allen Hamilton, Inc. (Booz Allen), CALIBRE Systems Inc./Ernst & Young LLP (CALIBRE/EY), and Deloitte Consulting LLP (Deloitte) have each held a GSA PM/CPI BPA at all times relevant in this case.  The RFQ provided that DHA intended to award a "BPA Call task order with a twelve (12) month Base Period with 4 (four) one (12) [sic] month option periods."  The first page of the RFQ explained that the "acquisition is being conducted pursuant to Federal Acquisition Regulation (FAR) 8.405-3(c)(2)(iii)."  Similarly, in explaining the selection procedures, DHA expressed its intent to follow the procedures required under "FAR 8.405-3(c)(2)(iii)(3)" in awarding the contract.  The RFQ was issued to all fifteen GSA PM/CPI BPA holders, including protestor and defendant-intervenors.  The total estimated value of the contract, including the base year and option periods, was $[redacted].

The RFQ required offerors to submit three volumes to be evaluated: "Technical Approach, Management Approach, and Price."  In Volume I, "Technical Approach," offerors were directed to address, at a minimum, their corporate experience, specifically their understanding of the current MHS governance construct, their experience supporting a similarly sized federal healthcare Program Integration Office, and transforming an enterprise healthcare system into a High Reliability Organization.  Also in Volume I, offerors were directed to address their corporate capability, including their access to healthcare industry best practice organizations, their change management and organizational development approach, and their military campaign planning capability.  In Volume II, "Management Approach," offerors were instructed to "provide the management approach (including approach to staffing) that will lead to the successful accomplishment of the requirements."  In Volume III, "Price," offerors were instructed to submit their firm fixed price.

According to the RFQ, quotes were to be "rated from highest to lowest based upon technical approach to include corporate experience and corporate capability, and management approach to include program management and key personnel and staffing."  The RFQ "did not ascribe weights to any of the areas to be considered," instead, the RFQ was designed to allow DHA "discretion to consider and rate the quotes as a whole."  The selection procedures in the RFQ explained, in rather general terms, that the contracting officer would award the BPA call order to the contractor that submitted "the highest rated quote proposing an appropriate mix of labor for the required level of effort at a fair and reasonable price."  If the contractor that submitted the highest rated quote did not "propose an appropriate mix of labor for the required effort at a fair and reasonable price," the contracting officer could "obtain additional information from, and negotiate with, that contractor to improve the terms of the deal reflected in its quote."  The selection procedures in the RFQ further explained:

> If the contracting officer is unable to negotiate a favorable deal with the contractor, he or she reserves the right to negotiate and reach agreement with the firm submitting the next highest rated quote. This process will continue until a contract has been reached or until all those firms submitting

http://www.gsa.gov/portal/content/245439 (last visited Feb. 29, 2016).  This change does not affect this bid protest.

a quote have been considered. If agreement on a deal cannot be reached with any of the firms, negotiations may be reopened with all firms or the solicitation may be canceled.

Also, the RFQ contained the clauses and terms that would be incorporated into the contract award.  Specifically, among the clauses included was a data rights term, which stated:

> **1.6.16.  Data Rights:** The Government has unlimited rights to all documents/material produced under this contract. All documents and materials, to include the source codes of any software, produced under this contract shall be Government owned and are the property of the Government with all rights and privileges of ownership/copyright belonging exclusively to the Government. These documents and materials may not be used or sold by the contractor without written permission from the Contracting Officer. All materials supplied to the Government shall be the sole property of the Government and may not be used for any other purpose. This right does not abrogate any other Government rights.

(emphasis in original).

On June 22, 2015, DHA received five quotes in response to the RFQ issued on May 29, 2015, and evaluation began on June 23, 2015.  The technical evaluation board (TEB) was comprised of one individual, Colonel Soo Lee Davis.  Price reasonableness was determined by the contracting officer. The TEB's findings are in the technical evaluation report. The TEB rated the five quotes from highest to lowest based on their technical approach as follows: (1) PwC; (2) CALIBRE/EY; (3) Booz Allen; (4) Deloitte; and (5) [redacted].

The price analysis report, created for evaluation purposes, included an examination of the offerors' price reasonableness and concluded that PwC's quoted prices were fair and reasonable.  Ultimately, the Source Selection Official, who was the contracting officer, determined that PwC was able to "perform the work in accordance with the PWS; based on technical approach, management approach, and price.  PWC's prices have been determined fair and reasonable." As a result, PwC was awarded contract no. GS10FAA069 on September 1, 2015 for $53,507,742.55.

Subsequently, three disappointed offerors, Booz Allen, CALIBRE/EY, and Deloitte timely filed bid protests at the GAO in August 2015 challenging the BPA task order award to PwC.  See Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *2. As a result of the bid protest, DHA issued a stop work modification to PwC on August 7, 2015, "in accordance with FAR 52.242-15 due to a bid protest," which remains in effect.  PwC intervened in the GAO proceeding.  Initially, DHA moved to dismiss Booz Allen and Deloitte's protests on the basis that neither offeror was an interested party, however, in a one sentence e-mail on September 9, 2015, the GAO denied DHA's motion.  Then, on November 16, 2015, the GAO issued its decision partially

sustaining the protest after finding several defects in the procurement, over the objections of PwC and DHA.  See id.

The GAO partially sustained the protest on four grounds. In its decision, the GAO explained:

> In reviewing a protest challenging an agency's technical evaluation, our Office will not reevaluate the quotations; rather, we will examine the record to determine whether the agency's evaluation conclusions were reasonable and consistent with the terms of the solicitation and applicable procurement laws and regulations.

Id. at *4. The GAO first partially sustained the protest on the ground that DHA unreasonably evaluated PwC's quotation with regard to the corporate experience factor, which was part of PwC's technical approach, by unjustifiably crediting it with the experience of its parent company, PricewaterhouseCoopers US (PwC US). See id. at *6. The RFQ directed offerors to address "Corporate Experience" in their quotes, and to specifically discuss their understanding of the current MHS Government construct "or a similar organizational structure in a very large enterprise corporate headquarters"; their relevant experience "identical, similar, or related to supporting a very large federal healthcare program integration office"; and their "[r]elevant experience related to improving the safety, access, and quality of a very large healthcare system, in the public or private sector, using high reliability principles as described by The Joint Commission." In evaluating PwC's proposal, DHA relied on [redacted] examples included in PwC's quote that PwC offered to demonstrate its experience supporting large healthcare systems improve their quality.  DHA concluded that PwC exceeded the requirements of the PWS and clearly had the experience needed to perform the contract.  See id.  The GAO, however, found that "PwC's quotation did not specifically explain or differentiate throughout its quotation as to whether particular resources or experiences related to PwC Public Sector as opposed to PwC US," and PwC's "quotation did not specifically explain how PwC Public Sector would work with PwC US during the performance of the contract in a way that demonstrated that the experience of the latter should be credited to the former." Id. The GAO explained that although "it is appropriate to consider an affiliate's performance record where the affiliate will be involved in the contract effort, it is inappropriate to consider an affiliate's record where there is no evidence that the affiliate will meaningfully participate in performance of the contract." Id.  At the GAO, to support DHA's contract award decision, PwC argued that references to PwC US in its quote adequately supported DHA's evaluation of PwC's corporate experience, however, the GAO concluded that "the record does not reasonably explain why DHA credited PwC Public Sector with the experience of PwC US," and, therefore, the GAO sustained the protest on the corporate experience ground.  Id.

As a second basis to partially sustain the protest, the GAO found that PwC had taken exception to the data rights clause included in the RFQ by including the following language in its quote:

[Redacted.] Unless required by the Act, neither the contract deliverables nor their content may be distributed to, discussed with, or otherwise disclosed to any Third Party without PwC's prior written consent. [Redacted.]

The GAO determined that the data rights term in the RFQ was a clearly stated solicitation requirement and material to the needs of the government. See id. at *7. The GAO explained that "[i]n negotiated procurements, clearly stated solicitation requirements are considered material to the needs of the government, and a quotation that fails to conform to material terms and conditions of the solicitation is unacceptable and cannot form the basis for award." Id. The GAO compared the language in PwC's quote with the data rights term in the RFQ and explained that "[w]hereas the solicitation clause gives the government unlimited and exclusive property rights to all documents produced under the task order, PwC's quotation limits the government's right to distribute contract deliverables to third parties without the awardee's 'prior written consent.'" Id. Accordingly, because the language in PwC's quote deviated from the data rights term in the RFQ, the GAO determined that DHA should have found PwC's quote unacceptable, and the GAO sustained the protest on this basis. See id. at *8. Notably, in defending against this protest ground, DHA asserted that the data rights term in the RFQ was not considered material, however, the GAO decided that DHA's argument was "not consistent with the plain language of the data rights clause that the agency elected to tailor and insert into the solicitation." Id. at *7. The language of the clause in the RFQ appears to be quite clear. In the contracting officer's declaration submitted to this court in response to the current protest, she indicated that the agency "always intended to obtain" unlimited data rights, implying that the term is a material requirement.

As a third basis to partially sustain the protest, the GAO determined that DHA had failed to properly consider and document PwC's proposed labor mix. See id. at *9. The selection procedures included in the RFQ explained, generally, that the contracting officer would "award a BPA call to the contractor submitting the highest rated quote proposing an appropriate mix of labor for the required level of effort at a fair and reasonable price." DHA's consideration of the offerors' proposed labor mixes is reflected in the price analysis report and the technical evaluation report. The GAO, however, found two issues related to DHA's consideration of PwC's proposed labor mix. First, the GAO found that the technical evaluator's "assessment focused solely on the hours and positions proposed by PwC for its key personnel," and not PwC's entire staffing approach. Id. at *9-10. The GAO stated that "although the TEB evaluator reviewed PwC's labor mix and hours, she addressed only the hours that PwC proposed for its key personnel labor categories in the base year." Id. at *10. As a result, the GAO concluded that "the agency did not reasonably evaluate whether PwC's overall proposed labor mix, which included [redacted] FTEs [full time equivalents], was appropriate for the level of effort, as required by the RFQ." Id. The GAO also agreed with the protestors' allegation that "the agency's positive assumptions, as reflected in the evaluation of PwC's labor mix in connection with the management approach factor, are not supported by PwC's quotation." Id.

The GAO found further that "certain areas" of DHA's evaluation of Booz Allen and Deloitte's quotes reflected unequal treatment and partially sustained the protest on that

additional basis. See id. at *12. In finding these reasons to partially sustain the protest against the award to PwC, the GAO briefly discussed the prejudice suffered by the protestors, but did not discuss if, or how, the prejudice differed between the protestors. See id. at *15. Instead, the GAO summarily found prejudice because "certain areas of the agency's evaluation were not reasonable, and because the record did not show how a proper evaluation would have affected the ranking of the vendors' proposals." Id.

In deciding the protest, the GAO also considered CALIBRE/EY's argument that "the award to PwC was tainted by an impermissible OCI [organizational conflict of interest] because PwC consulted with, and received non-public, competitively useful, inside information from a DHA consultant." Id. at *13. CALIBRE/EY also argued that "PwC had unequal access to information as a result of its contract with DHA to support MHS Governance." Id. Citing FAR subpart 9.504, the GAO explained that "the responsibility for determining whether an actual or apparent conflict of interest will arise, and to what extent the firm should be excluded from the competition, rests with the contracting agency." See Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *15. The GAO stated that an unequal access to information conflict of interest arises "where a firm competing for a government contract has '[p]roprietary information that was obtained from a Government official without proper authorization' or 'source selection information . . . that is relevant to the contract but [was not made] available to all competitors, and such information would assist that contractor in obtaining the contract.'" Id. (alterations in original). The GAO explained that, in response to CALIBRE/EY's OCI allegation, the contracting officer conducted an OCI investigation. See id. at *14. The GAO summarized the contracting officer's findings:

> With respect to the consultant, the CO's investigation found the following: (1) the consultant retired from the Army in 2012 but never worked for DHA in any capacity; (2) a Power Point presentation cited in CALIBRE's protest, which involved a project involving the consultant and college students, did not directly involve PwC or include any DHA non-public competitively useful information; (3) the consultant's involvement in market research was limited to introducing an industry representative to an agency official-months in advance of when the official developed the solicitation-by arranging the industry representative's attendance at meetings with the agency official; and that a member of the CALIBRE team was invited to the same meeting.

Id. Furthermore, according to the GAO's decision, the contracting officer found that:

> MHS Governance and HRO transformation were two separate agency initiatives; that PwC's Governance contract did not involve defining the RFQ's requirements, would not impair PwC's objectivity, and did not give PwC access to non-public competitively useful information beyond the normal experience gained in the performance of the contract.

Id.  Ultimately, the contracting officer concluded that PwC did not have an unequal access to information OCI, and the GAO found the contracting officer's conclusion to be reasonable.  See id.

In sustaining the protest, the GAO found that "DHA's evaluation and award decision were inconsistent with the terms of the solicitation and lacked a reasonable basis."  Id. at *15. The GAO, therefore, recommended that:

> the agency reevaluate quotations consistent with our decision, and conduct discussions and solicit revised quotations.  To the extent DHA believes that the data rights clause is not material, the agency should amend the RFQ, and request revised quotations.  Following the revised evaluation, the agency should make a new award decision.

Id.

Following the GAO's decision to sustain the protest, the DHA contracting officer issued an amendment to RFQ 1055980-HT0011-15-T-0022 to "re-solicit the subject requirement to all GSA PM/CPI BPA eligible vendors."  The administrative record does not contain subsequent memoranda or other contemporaneous documentation explaining DHA's decision to amend the RFQ or the changes made by DHA to the RFQ. The only information provided to the court that pertains to DHA's decision-making process in revising the RFQ, besides the amended RFQ itself, are declarations submitted to this court by the defendant from the contracting officer and the Government Lead for the MHS Review Project Management Office.

As amended, the RFQ requires offerors to submit two volumes: a non-price volume and a price volume.  Under "Factor 1: Technical Approach" there are four subfactors: (1) patient safety approach, (2) process improvement approach, (3) plan for quality expert approach, and (4) PAG (Perinatal Advisory Group) and coding approach. Each subfactor also has associated numbered action plans, which are derived from the MHS review discussed previously. Neither these subfactors, nor the specific numbered action plans, were included in the previous RFQ's list of factors or evaluation criteria.  Corporate experience, which was the first listed item that offerors were directed to address under the previous RFQ, has been removed. Similarly, corporate capability, which was the second listed item that offerors were directed to address under the previous RFQ, is also no longer included.  As a result of the revisions, offerors are no longer instructed to address their access to healthcare industry best practice organizations or their military campaign planning capability.  In her declaration filed in this court on January 20, 2016, the contracting officer stated that as part of the

> overall review of the evaluation approach, the program team (none of whom were involved in the previous evaluation of quotes) decided that evaluating corporate capability/experience and military campaign planning as in the original procurement would not help the Agency identify the best quote or differentiate between quotes. Instead, the team decided to focus the

evaluation on the vendors' specific experience performing prior similar tasks.

Additionally, in her declaration, the contracting officer stated that "the program office revised the PWS to also take into account changes in the Agency's requirements, in part because quite a bit of time had passed since the Agency originally issued the solicitation." Similarly, in her declaration, the Government Lead for the MHS Review Project Management Office stated that changes also were made to the PWS based on changes in the agency's requirements.

Under the revised RFQ, the procurement is still being conducted in accordance with FAR subpart 8.4. Similar to the previous RFQ, the revised RFQ explains that DHA intends to follow the procedures prescribed in FAR 8.405-3(c)(2)(iii)(A)(3).  The RFQ, however, has been changed to be a "best value" type procurement.  Whereas under the previous RFQ the factors were of equal importance, the revised RFQ lists the factors and subfactors in descending order of importance:

> Factor 1: technical approach
> > Subfactor 1a: patient safety approach
> > Subfactor 1b: process improvement approach
> > Subfactor 1c: plan for quality expert approach
> > Subfactor 1d: PAG and coding approach
> Factor 2: experience
> > Subfactor 2a: transforming an enterprise healthcare system in an HRO
> > Subfactor 2b: Experience supporting a similarly sized federal healthcare Program Integration Office
> Factor 3: program management approach
> Factor 4: key personnel and staffing
> Factor 5: price

The revised RFQ also states, "[t]he non-price factors, when combined, are more important than price."

According to the contracting officer's January 20, 2016 declaration, DHA considered "the breadth of the GAO's decision and recommendation" and decided "to amend the RFQ to include those evaluation criteria we believe will result in the best solution for the Agency and to more fully communicate the basis on which quotes will be evaluated."  The contracting officer explained in her declaration:

> [W]e revised the evaluation to indicate that, instead of evaluating the offerors' proposed approaches for completing all PWS tasks, the Agency would evaluate the offerors' proposed approaches to four specified areas. This will help ensure that the Agency obtains what it really needs by allowing us to better distinguish between the merits of the quotes and to make award to the vendor most likely to not only successfully, but also exceptionally, meet the requirement.

Additionally, to avoid a pre-award protest for not affording greater weight to price in the evaluation, the contracting officer indicated that DHA "revised the evaluation to make it a best value trade-off under which we [DHA] would trade the technical factors against price with the technical factors being more important than price."

The revised RFQ incorporated Defense Federal Acquisition Regulation Supplement (DFARS) clause 252.227-7015, "Technical Data—Commercial Items."[5] The

---

[5] This clause states, in relevant part, that:

(b) License. (1) The Government shall have the unrestricted right to use, modify, reproduce, release, perform, display, or disclose technical data, and to permit others to do so, that—

(i) Have been provided to the Government or others without restrictions on use, modification, reproduction, release, or further disclosure other than a release or disclosure resulting from the sale, transfer, or other assignment of interest in the technical data to another party or the sale or transfer of some or all of a business entity or its assets to another party;

(ii) Are form, fit, and function data;

(iii) Are a correction or change to technical data furnished to the Contractor by the Government;

(iv) Are necessary for operation, maintenance, installation, or training (other than detailed manufacturing or process data); or

(v) Have been provided to the Government under a prior contract or licensing agreement through which the Government has acquired the rights to use, modify, reproduce, release, perform, display, or disclose the data without restrictions.

(2) Except as provided in paragraph (b)(1) of this clause, the Government may use, modify, reproduce, release, perform, display, or disclose technical data within the Government only. The Government shall not—

(i) Use the technical data to manufacture additional quantities of the commercial items; or

(ii) Release, perform, display, disclose, or authorize use of the technical data outside the Government without the Contractor's written permission unless a release, disclosure, or permitted use is necessary for emergency repair or overhaul of the commercial items furnished under this contract, or for performance of work by covered Government support contractors.

(3) The Contractor acknowledges that—

(i) Technical data covered by paragraph (b)(2) of this clause are authorized to be released or disclosed to covered Government support contractors;

(ii) The Contractor will be notified of such release or disclosure. . . .

48 C.F.R. § 252.227-7015(b) (2016).

contracting officer stated in her declaration submitted to this court that DHA also modified "the data rights language at paragraph 1.6.16 of the PWS. That modification, however, did not change the Agency's requirement of unlimited rights, which is what we always intended to obtain."

The RFQ subsequently was amended on January 8, 2016 (amendment 4), January 19, 2016 (amendment 5), January 21, 2016 (amendment 6), and February 8, 2016 (amendment 7).[6] Offerors are required to submit their quotes in response to the revised RFQ on or before February 29, 2016.

On January 19, 2016, PwC filed its protest in this court and moved for a temporary restraining order and/or preliminary injunction to enjoin DHA from resoliciting quotes, conducting a new evaluation, and making a new award until the court has the opportunity to resolve the merits of PwC's request for a preliminary and permanent injunction and to provide a meaningful remedy. Defendant and defendant-intervenors CALIBRE/EY, Booz Allen, and Deloitte each oppose PwC's request for a temporary restraining order and/or a preliminary injunction. Defendant-intervenors CALIBRE/EY and Booz Allen also have asserted that this protest should be dismissed in its entirety pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) (2015) for lack of subject matter jurisdiction because of the prohibition in the Federal Acquisition Streamlining Act (FASA), 10 U.S.C. § 2304c(e) (2012), against protests of task or delivery orders.

In support of its motion for a temporary restraining order and/or a preliminary injunction, PwC alleges that all of the defendant-intervenors, CALIBRE/EY, Booz Allen, and Deloitte, should be disqualified from competing under the revised RFQ for the task order due to unavoidable and unmitigated organizational conflicts of interest.[7] Protestor alleges that CALIBRE/EY, Booz Allen, and Deloitte provided support to the initial 90-day MHS Review, the follow-on MHS Review, and/or the subsequent HRO Task Force. Specifically, with regard to CALIBRE/EY, protestor alleges that one of the key personnel in its proposal, Dr. Pronovost, was listed in the MHS Review Final Report as "one of six reviewers of [the] MHS Review document, and his recommendations are prominently featured in the MHS Review publication." Similarly, protestor alleges that 23 of the individuals involved in the MHS Review were listed as [redacted] personnel in Booz Allen's proposal submitted in response to the previous RFQ. In addition to the alleged involvement with the MHS Review, protestor "believe[s]" that Booz Allen and Deloitte supported the follow-on working group created after the MHS Review. Protestor also alleges that Booz Allen and Deloitte "played an instrumental role" in the HRO Task Force, which was created after the follow-on working group to the MHS Review, and that Dr.

---

[6] Protestor in the above-captioned case is challenging amendments 3, 4, and 5 to the RFQ, which changed the solicitation requirements and evaluation criteria and were issued after the GAO's decision. Amendments 6 and 7 were issued after protestor filed this bid protest and addresses only the deadlines for offerors to submit OCI mitigation plans and quotations.

[7] During the GAO protest, OCI allegations were asserted against only PwC.

Pronovost of CALIBRE/EY "had access to what the HRO Task Force was doing." As a result of this involvement, PwC alleges that "[Booz Allen] and Deloitte (and likely also Dr. Pronovost) have had real time access to and have been involved in creating the requirements and approach that are now going to be evaluated." In addition to protestor's allegations that Booz Allen, Deloitte, and CALIBRE/EY were previously involved and supported the MHS Review, the follow-on to the MHS Review, and the HRO Task Force, protestor also alleges that "none of the action plans identified in the [revised] RFQ, or the confidential information made available to BAH [Booz Allen], Deloitte, or Dr. Pronovost, have been made available to PwC except for a limited disclosure of information on January 7, 2016," which included the MHS Review Final Report, the MHS Review Follow-On Report, HRO Task Force deliverables, and other working group items.[8] Accordingly, protestor alleges Booz Allen, CALIBRE/EY, and Deloitte should be disqualified due to biased ground rules, unequal access to information, and impaired objectivity. In response, defendant-intervenors Booz Allen, CALIBRE/EY, and Deloitte assert that protestor's OCI allegations are baseless, without merit, and premature since the proposals in response to the revised RFQ have not yet been submitted, the agency has not yet investigated the alleged OCIs, and, therefore, there is no agency final decision regarding the OCIs for this court to review. Defendant has moved to dismiss protestor's OCI allegations for failure to state a claim because protestor "fails to allege facts demonstrating a clear and prejudicial violation of procedural regulations," "[c]ontracting officers have broad discretion regarding the timeframes in which they execute their functions," and protestor's OCI allegations "are premature and not ripe for adjudication." In response, protestor explains that it is "*not* contending that this Court supplant the Agency's obligation to determine" whether defendant-intervenors possess OCIs. (emphasis in original). Instead, "PwC is asking the Court to declare this [revised] RFQ to be an unreasonable response to GAO's decision."

## DISCUSSION

<u>Motion to Dismiss for Lack of Subject Matter Jurisdiction</u>

As a threshold matter, the court addresses defendant-intervenors CALIBRE/EY and Booz Allen's allegations that this court does not have subject matter jurisdiction to decide PwC's bid protest in the above-captioned case because FASA, 10 U.S.C. § 2304c(e), should preclude this court from hearing protests "in connection with the issuance or proposed issuance of a task or delivery order," with limited exceptions, which according to the defendant-intervenors, are not applicable to this case. 10 U.S.C. § 2304c(e)(1). In its response to PwC's motion for a temporary restraining order and/or a

---

[8] PwC alleges that these items totaled nearly 1,000 pages and were only provided to it on January 7, 2016, when the deadline to submit quotations to the revised RFQ was January 19, 2016. According to protestor, this created an unfair disadvantage to PwC regarding the revised quotations as compared to the other eligible offerors. Deloitte, however, indicated in its submission to this court that it did not have access to the MHS Review Follow-On Report until one additional week after January 7, 2016. In fact, the submission due date for quotes responding to the revised RFQ ultimately changed to February 29, 2016, thereby affording PwC more than 30 days to review the documents.

preliminary injunction, defendant only asserts that there "is a question whether the Court has jurisdiction of the entire complaint given the Federal Acquisition Streamlining Act (FASA), 10 U.S.C. § 2304c(e), which provides GAO exclusive jurisdiction," however, defendant did not directly allege that this court lacks subject matter jurisdiction.  It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'"  Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)).  "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press."  Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428 (2011); see also Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not.").  "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."  Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Hymas v. United States, 810 F.3d 1312, 1317 (Fed. Cir. 2016) (explaining that a federal court must satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time."  (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011).  In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue."  Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006).

This court has jurisdiction to hear bid protests pursuant to 28 U.S.C. § 1491(b)(1) (2012) of the Tucker Act, which provides that this court has

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged

violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  The Administrative Dispute Resolution Act of 1996 (ADRA), codified at 28 U.S.C. § 1491(b)(1)–(4), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001).  Furthermore, the United States Court of Appeals for the Federal Circuit has established that this court has jurisdiction over a bid protest based on an agency's decision to take corrective action. See Chapman Law Firm Co. v. Greenleaf Const. Co., 490 F.3d 934, 937-38 (Fed. Cir. 2007).  FASA, however, includes a provision that limits the court from adjudicating protests "in connection with the issuance or proposed issuance of a task or delivery order" except under limited exceptions stated in the statute, 10 U.S.C. § 2304c(e), with the general authority to hear protests involving task or delivery order awards that exceed ten million dollars given to the GAO.  See 10 U.S.C. § 2304c(e). Specifically, FASA provides:

> (e) Protests.--(1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for—
>> (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or
>> (B) a protest of an order valued in excess of $10,000,000.
> (2) Notwithstanding section 3556 of title 31, the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).

10 U.S.C. § 2304c(e).[9]  The United States Court of Appeals for the Federal Circuit has explained that "[t]he statutory language of FASA is clear and gives the court no room to exercise jurisdiction over claims made 'in connection with the issuance or proposed issuance of a task or delivery order.'" SRA Int'l, Inc. v. United States, 766 F.3d 1409, 1413 (Fed. Cir. 2014) (quoting 10 U.S.C. § 2304c(e)) (acknowledging that "this statute is somewhat unusual in that it effectively eliminates all judicial review for protests made in connection with a procurement designated as a task order").

Jurisdiction to adjudicate protests connected to task or delivery orders issued against General Services Administration (GSA) Federal Supply Schedules (FSSs) has

---

[9] A task order contract is defined as "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." 10 U.S.C. § 2304d(1) (2012). A delivery order contract is defined as "a contract for property that does not procure or specify a firm quantity of property (other than a minimum or maximum quantity) and that provides for the issuance of orders for the delivery of property during the period of the contract." 10 U.S.C. § 2304d(2).

been found in this court, and the Federal Circuit has upheld the finding. See Distrib. Sols., Inc. v. United States, 106 Fed. Cl. 1, 11 (2012) aff'd, 500 F. App'x 955 (Fed. Cir. 2013). Judges on this court have found that FASA's "limitation on the protest of task or delivery orders in the Court of Federal Claims. . . does not extend to task orders issued pursuant to the GSA FSS" under FAR subpart 8.4, 48 C.F.R. § 8.4.  See id.; see also Data Mgmt. Servs. Joint Venture v. United States, 78 Fed. Cl. 366, 371 (2007) (holding that the court's "protest jurisdiction extends to protests of task or delivery orders placed against a GSA schedule contract"); Idea Int'l, Inc. v. United States, 74 Fed. Cl. 129, 135 (2006) (explaining that 10 U.S.C. § 2304c(d) "is not intended to apply to protests relating to the placement of orders under GSA Federal Supply Schedule contracts").  In holding that the Court of Federal Claims has subject matter jurisdiction to hear a bid protest arising from the issuance, or proposed issuance, of a task or delivery order under a GSA FSS contract, Judges of this court have relied on the statutory and regulatory history of FASA and the implementing regulation at FAR subpart 16.5, 48 C.F.R. § 16.5, which applies to indefinite delivery/indefinite quantity contracts. See, e.g., Idea Int'l, Inc. v. United States, 74 Fed. Cl. at 135 (stating that the FSS program "existed long before the passage of FASA in 1994, and the language of section 2304a(g) confirms that congress intended for the FSS program to remain separate and distinct from the new FASA authority"); Data Mgmt. Servs. Joint Venture v. United States, 78 Fed. Cl. at 371 n.4 (explaining that the contracts authorized under FASA "are different from GSA schedule contracts. . . even though both types of contracts utilize task or delivery orders to trigger performance or delivery").  FAR subpart 16.5 implements the FASA jurisdictional bar:

> (10)(i) No protest under subpart 33.1 is authorized in connection with the issuance or proposed issuance of an order under a task-order contract or delivery-order contract, except for—
>> (A) A protest on the grounds that the order increases the scope, period, or maximum value of the contract; or
>> (B) A protest of an order valued in excess of $10 million. Protests of orders in excess of $10 million may only be filed with the Government Accountability Office, in accordance with the procedures at 33.104.

48 C.F.R. § 16.505(a)(10) (2016).  FAR subpart 16.5 "prescribes policies and procedures for making awards of indefinite-delivery contracts and establishes a preference for making multiple awards of indefinite-quantity contracts."  48 C.F.R. § 16.500(a) (2016).  The scope of FAR subpart 16.5, however, specifically and explicitly distinguishes the policies and procedures set forth therein from FAR subpart 8.4, GSA Federal Supply Schedules. See 48 C.F.R. § 16.500(c):

> Nothing in this subpart restricts the authority of the General Services Administration (GSA) to enter into schedule, multiple award, or task or delivery order contacts under any other provision of law.  Therefore, GSA regulations and the coverage for the Federal Supply Schedule program in subpart 8.4 and part 38 take precedence over this subpart [subpart 16.5].

17

Id.; see also Labat-Anderson Inc. v. United States, 50 Fed. Cl. at 105 (explaining that the language at FAR subpart 16.5 supports the interpretation that the FASA task and delivery order protest restriction was not intended to apply to FSS procurements). Furthermore, the language and history of FASA indicate that "Congress understood the difference between GSA Schedule contracts and task or delivery order contracts, but the prohibition on bid protests in 10 U.S.C. § 2304c(d) makes no mention of orders under 'schedule contracts.'" Idea Int'l, Inc. v. United States, 74 Fed. Cl. at 135.

The parties do not dispute that the bid protest in the above-captioned case is in connection with a task order issued against a GSA BPA established under the GSA FSS 874 contract.  Both the former and current versions of the RFQ provide that DHA intended to award a BPA call task order to one of the holders of the GSA PM/CPI BPA, which was created under the MOBIS Federal Supply Schedule (also known as Schedule 874). Moreover, the RFQ explains that the task order acquisition is being conducted pursuant to FAR subpart 8.4, which provides the procedures for ordering against a GSA FSS BPA. Defendant-intervenor CALIBRE/EY acknowledges in its motion to dismiss that the task order at issue is being awarded under an existing BPA that was "awarded under the GSA FSS (specifically, the MOBIS schedule)."  In its motion to dismiss, however, defendant-intervenor CALIBRE/EY attempts to draw the distinction that the task order involved in the above-captioned protest is connected to an isolated GSA BPA, not a GSA FSS.  This is an artificial distinction, however, because the task order was issued against a GSA FSS BPA (the GSA PM/CPI BPA, established under GSA FSS 874).  In attempting to isolate the task order at issue from the GSA FSS 874 contract by arguing that "the BPA here is a task order contract that operates as a standalone umbrella" contract, defendant-intervenor CALIBRE/EY assigns illusory importance to the fact that the task order is being awarded against the GSA PM/CPI BPA instead of directly against the GSA FSS, under which the BPA was established.  In fact, FAR subpart 8.405-3 prescribes that only FSS contractors are even eligible to enter in to a FSS BPA, thus BPAs established under a GSA FSS are not "standalone umbrella" contracts as defendant-intervenor CALIBRE/EY contends.  See 48 C.F.R. § 8.405-3(a)(1).

Defendant-intervenor CALIBRE/EY also does not acknowledge the clear language in the RFQ that the task order was to be awarded pursuant to the ordering procedures in FAR subpart 8.4, which apply to GSA FSS BPA orders, not FAR subpart 16.5.  FAR subpart 8.4, applicable to "Federal Supply Schedules," authorizes the GSA to establish a BPA under any schedule contract "to fill repetitive needs for supplies or services." 48 C.F.R. § 8.405-3(a).  FAR subpart 8.405-3(c)(2)(iii) prescribes the process for ordering from such BPAs:

(iii) Orders exceeding the simplified acquisition threshold.
(A) The ordering activity shall place an order in accordance with paragraphs (c)(2)(iii)(A)(1), (2) and (3) of this paragraph, unless the requirement is waived on the basis of a justification that is prepared and approved in accordance with 8.405–6. The ordering activity shall—

> (1) Provide an RFQ to all BPA holders offering the required supplies or services under the multiple-award BPAs, to include a description of the supplies to be delivered or the services to be performed and the basis upon which the selection will be made;
> (2) Afford all BPA holders responding to the RFQ an opportunity to submit a quote; and
> (3) Fairly consider all responses received and make award in accordance with the selection procedures.
> (B) The ordering activity shall document evidence of compliance with these procedures and the basis for the award decision.

48 C.F.R. § 8.405-3(c)(2)(iii). Defendant-intervenor CALIBRE/EY's reasoning leads to the illogical conclusion that, although FASA may not bar this court from exercising jurisdiction over bid protests connected to a task order issued against a GSA FSS using FAR subpart 8.4 procedures, FASA should bar this court from exercising jurisdiction over a bid protest connected to a task order awarded against a GSA FSS BPA using FAR subpart 8.4 procedures. That a task order is issued using FAR subpart 8.4 procedures against a BPA established under a GSA FSS, instead of directly against a GSA FSS, however, does not automatically exclude a bid protest connected to that task order from this court's jurisdictional purview.

Defendant-intervenor CALIBRE/EY also argues that the "plain language of FASA, as broadly interpreted by the Federal Circuit in SRA International, Inc. v. United States, precludes this Court from exercising jurisdiction over protests made 'in connection with the issuance or proposed issuance of a task or delivery order.'" In response, protestor argues that its protest "arises from an RFQ relating to a task order issued under the General Services Administration (GSA) Federal Supply Schedule (FSS) for mission-oriented business integrated services (MOBIS)," and this court "has uniformly exercised jurisdiction over protests relating to such FSS task orders" despite the FASA provision that bars this court from exercising jurisdiction over protests related to task or delivery orders. Protestor contends that the case defendant-intervenor CALIBRE/EY relies upon, SRA International, Inc. v. United States, "did not concern an [sic] FSS order, made no mention of FSS contracts, and otherwise did not purport to disturb the settled law that FSS contracts are exempt from the FASA prohibition of protests."

In SRA International, Inc. v. United States the Federal Circuit reviewed a bid protest following the award of a task order under a GSA Government-Wide Acquisition Contract (GWAC) and considered the application of the FASA bid protest bar to the issuance of the task order at issue. See SRA Int'l, Inc. v. United States, 766 F.3d at 1409. The Federal Circuit held that the lower court erred in finding that it had subject matter jurisdiction to hear the bid protest because FASA "gives the court no room to exercise jurisdiction over claims made 'in connection with the issuance or proposed issuance of a task or delivery order.'" Id. at 1413. Notwithstanding defendant-intervenor CALIBRE/EY's assertion that "the Federal Circuit confirmed the breadth of the FASA protest bar" in SRA International, Inc. v. United States, the Federal Circuit's decision did not address bid

protests arising from task or delivery orders awarded against a GSA Federal Supply Schedule contract or a GSA FSS BPA, nor did the Federal Circuit discuss the multiple Court of Federal Claims decisions holding that FASA does not apply to bid protests associated with GSA FSS contracts.  In fact, the Federal Circuit's decision in <u>SRA International, Inc. v. United States</u> was in harmony with at least one previous decision from the Court of Federal Claims finding that FASA barred the court from hearing bid protests connected to task or delivery orders issued against a GWAC that cited FAR subpart 16.5 as controlling over any protests of orders issued against it. <u>See Chameleon Integrated Servs., Inc. v. United States</u>, 111 Fed. Cl. 564, 570 (2013). GWACs are distinguished in the FAR from GSA FSS contracts.  <u>Compare</u> 48 C.F.R. § 8.402(a) (explaining that the Federal Supply Schedule program is directed and managed by GSA and provides Federal agencies with a "simplified process for obtaining commercial supplies and services at prices associated with volume buying") <u>with</u>, 48 C.F.R. § 16.505 (listing a GWAC as an example of a task or delivery order contract awarded by another agency and setting forth the procedures for placing orders against a GWAC), <u>and</u>, 48 C.F.R. § 17.501 (2016) (categorizing GWACs as a special contracting method associated with interagency acquisitions that can be used by agencies other than GSA).  While FAR subpart 8.4 prescribes how orders should be placed against GSA FSS contracts and GSA FSS BPAs, the procedures for ordering against a GWAC are provided in FAR subpart 16.5.  <u>See</u> 48 C.F.R. § 8.405; <u>see also</u> 48 C.F.R. § 16.505(a)(8). A GWAC issued by the GSA should not be conflated with a GSA FSS contract because the two contracting vehicles (a GWAC and a GSA FSS) are specifically distinguished in the FAR.  Also, the procedures in FAR subpart 8.4 pertaining to issuing a task or delivery order against a GSA FSS or a GSA FSS BPA are separate from and inapplicable to issuing a task or delivery order against a GWAC issued by GSA or any other agency.  <u>See</u> 48 C.F.R. § 8.4; <u>see also</u> 48 C.F.R. § 16.505(a)(8).  Moreover, before <u>SRA International, Inc. v. United States</u>, the Federal Circuit had affirmed the decision in <u>Distributed Solutions, Inc. v. United States</u>, 106 Fed. Cl. 1, 11 (2012), <u>aff'd</u>, 500 F. App'x 955 (Fed. Cir. 2013), indicating that the Court of Federal Claims has jurisdiction in bid protests of task or delivery orders issued against GSA FSSs, <u>see id.</u> at 11, and the Federal Circuit did not address or disturb that decision in <u>SRA International, Inc. v. United States</u>.

As explained above, the RFQ in the above-captioned protest was issued to holders of the GSA PM/CPI BPA, which was created under the GSA FSS 874 contract (MOBIS contract). Finding that the Federal Circuit's decision in <u>SRA International, Inc. v. United States</u> does not apply to the above-captioned protest, and as found in prior decisions issued by other Judges on the Court of Federal Claims, <u>see Distrib. Sols., Inc. v. United States</u>, 106 Fed. Cl. at 11; <u>Data Mgmt. Servs. Joint Venture v. United States</u>, 78 Fed. Cl. at 371; <u>Idea Int'l, Inc. v. United States</u>, 74 Fed. Cl. at 135, this court finds that it has subject matter jurisdiction to hear PwC's bid protest, which is connected to a task order to be issued against the GSA FSS contract 874 PM/CPI BPA, pursuant to the procedures prescribed in FAR subpart 8.4.

<u>Request for Injunctive Relief</u>

Protestor has moved for a temporary restraining order and/or preliminary injunction and declaratory relief "seeking an order from this Court enjoining the [DHA] from proceeding with the re-solicitation, re-evaluation, and re-award of a new order for support services" under RFQ No. HT0011-15-T-0022. To obtain a temporary restraining order or preliminary injunction, the protestor must carry the burden of establishing entitlement to extraordinary relief based on the following factors: (1) likelihood of success on the merits of the underlying litigation, (2) whether irreparable harm is likely if the injunction is not granted, (3) the balance of hardships as between the litigants, and (4) factors of the public interest.  See Trebo Mfg., Inc. v. Firefly Equipment, LLC, 748 F.3d 1159, 1165 (Fed. Cir. 2014); see also Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1344 (Fed. Cir. 2008) (citing Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1338-39 (Fed. Cir. 2003)), reh'g and reh'g en banc denied (Fed. Cir. 2009); see also U.S. Ass'n of Imps. of Textiles and Apparel v. U.S. Dep't of Commerce, 413 F.3d 1344, 1346 (Fed. Cir. 2005) (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983)); Pharm. Research and Mfrs. of Am. v. Walsh, 538 U.S. 644, 670 (2003) (requiring a movant for preliminary injunction to prove that the "probability of success on the merits of its claims . . . the risk of irreparable harm, the balance of the equities, and the public interest" weigh in the movant's favor); Somerset Pharms., Inc. v. Dudas, 500 F.3d 1344, 1346 (Fed. Cir. 2007) ("To establish entitlement to a preliminary injunction a movant must establish a reasonable likelihood of success on the merits." (citing Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004))); Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 523-24 (2003); OAO Corp. v. United States, 49 Fed. Cl. 478, 480 (2001) ("When deciding if a TRO [temporary restraining order] is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction." (quoting W & D Ships Deck Works, Inc. v. United States, 39 Fed. Cl. 638, 647 (1997))); Dynacs Eng'g Co. v. United States, 48 Fed. Cl. 614, 616 (2001). The standard of proof required for injunctive relief is a preponderance of the evidence, Textron, Inc. v. United States, 74 Fed. Cl. at 287, Bannum, Inc. v. United States, 60 Fed. Cl. 718, 723-24 (2004), or, demonstration of a fact as "more likely than not." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 329 (2007) (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983)). "No one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others.  If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors."  FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see also Belgium v. United States, 452 F.3d 1289, 1292-93 (Fed. Cir. 2006). A lack of a likelihood of success on the merits precludes the possibility of an injunction.  See CBY Design Builders v. United States, 105 Fed. Cl. 303, 328 (2012).

Regarding protestor's likelihood of success on the merits of the underlying protest, in this bid protest, protestor is challenging the agency's decision to take corrective action and to amend and resolicit quotes for services to support the transition of the HMS to an HRO following a GAO decision partially sustaining, on a number of grounds, an earlier, related bid protest to a BPA call order award to protestor.  In its motion for a temporary restraining order and/or preliminary injunction, protestor alleges

(1) DHA's corrective action is irrational because it is being taken in response to a GAO decision that, itself, is irrational and contrary to controlling law; (2) even if the GAO's decision were correct, which it is not, DHA's corrective action is unlawful because it is far broader than is necessary to correct the GAO's identified procurement errors, it includes changes to the evaluation scheme that do not result from any changes in agency needs, it unfairly favors PwC's competitors, and it is competitively harmful to PwC whose quote information has been disclosed to PwC's competitors; and (3) the corrective action mandates that certain competitors of PwC be disqualified due to significant organizational conflicts of interest (OCI[s]).

Protestor's allegations raise issues regarding DHA's decision to amend the RFQ and solicit new proposals. The ADRA provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Kingdomware Techs., Inc. v. United States, 754 F.3d 923, 930 (Fed. Cir.) ("In reviewing an agency's action in a bid protest case, we generally apply the Administrative Procedure Act's 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'without observance of a procedure required by law' standard of review." (citing 5 U.S.C. § 706(2)(A), (D) (2012)), reh'g en banc denied (Fed. Cir. 2014), cert. granted, 83 U.S.L.W. 3654 (U.S. June 22, 2015)); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003). The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), "provides a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d

at 1244 (quoting 41 U.S.C. § 403(2))); see also Rockies Exp. Pipeline LLC v. Salazar, 730 F.3d 1330, 1336 (Fed. Cir. 2013), reh'g denied (Fed. Cir. 2014); Distrib. Sols., Inc. v. United States, 539 F.3d 1340, 1346 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), reh'g denied (Fed. Cir. 2008); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir. 2013) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350–51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057–58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)), aff'd, 365 F.3d 1345 (Fed. Cir. 2004))), reh'g and reh'g en banc denied (Fed. Cir. 2013) (alterations in original). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2012);[10] see also Tinton Falls Lodging Realty, LLC v.

---

[10] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>    (B) contrary to constitutional right, power, privilege, or immunity;
>    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>    (D) without observance of procedure required by law;
>    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (internal citations omitted); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure.") (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32

---

        (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

(2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990). Moreover,

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322

(Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). """"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."""" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

> Stated otherwise by the United States Supreme Court:
>
> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) (internal citations omitted); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6–7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004), and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal withdrawn, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013); Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392

(1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001), and superseded by regulation as recognized in MVS USA, Inc. v. United States, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Const. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Kingdomware Techs., Inc. v. United States, 107 Fed. Cl. 226, 231 (2012) ("'Federal procurement entities have "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation."'" (quoting K-Lak Corp. v. United States, 98 Fed. Cl. 1, 8 (2011) (quoting Tyler Const. Grp. v. United States, 570 F.3d at 1334))), aff'd, 754 F.3d 923 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014), cert. granted, 83 U.S.L.W. 3654 (U.S. June 22, 2015); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 388 (2001), aff'd, 279 F.3d 985 (Fed. Cir.), reh'g denied (Fed. Cir. 2002). Furthermore, according to the Federal Circuit:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368–69 ("We have stated that procurement decisions 'invoke[ ]

"highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))); Cohen Fin. Servs., Inc. v. United States, 112 Fed. Cl. 153, 162 (2013); McVey Co., Inc. v. United States, 111 Fed. Cl. at 402.

A protestor has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995–96; Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

When a bid protest at this court challenges an agency's corrective action decision, the court's review is narrowly circumscribed, and this court should only set aside an agency's action that is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Chapman Law Firm Co. v. Greenleaf Const. Co., 490 F.3d at 938 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057. When the agency's corrective action decision was based, at least in part, on a GAO decision and recommendation, this court also considers whether the GAO decision was rational or not. See Centech Grp., Inc. v. United States, 554 F.3d 1029 (Fed. Cir. 2009); see also Honeywell, Inc. v. United States, 870 F.2d at 647 (explaining that Congress contemplated and intended that procurement agencies normally would follow the GAO's recommendation). Generally, an agency's decision to take corrective action in order to implement a GAO recommendation is proper unless the GAO decision itself is irrational. See Raytheon Co. v. United States, 809 F.3d 590, 595-96 (Fed. Cir. 2015); see also Centech Grp., Inc. v. United States, 554 F.3d at 1039. "[A] procurement agency's decision to follow the Controller General's recommendation, even though that recommendation differed from the contracting officer's initial decision, was proper unless the Comptroller General's decision itself was irrational." Honeywell, Inc. v. United States, 870 F.2d at 647. The Federal Circuit has indicated that where a GAO recommendation is based on more than one ground, finding one of the grounds to be rational may be sufficient to find the GAO decision was rational. See Raytheon Co. v. United States, 809 F.3d at 595-96. In the above-captioned protest, the protestor alleges that the GAO's recommendation was irrational, and, as such, "the agency's corrective action in response is irrational and should be enjoined." In determining protestor's likelihood of success on the merits on the underlying bid protest, the court considers whether the protestor is likely to succeed in proving that the agency's decision to take corrective action lacked a rational basis or involved a violation of a regulation or procedure so as to render the agency's decision

arbitrary and capricious. See Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1285–86.

As explained above, the GAO decision that preceded the above-captioned bid protest found four grounds to sustain the earlier, related protest filed at the GAO. See generally Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026.  In its motion for a temporary restraining order and/or a preliminary injunction, protestor argues that is it "likely to succeed on the merits because GAO erred in sustaining the protest."  Protestor argues that each of the grounds of the GAO's decision was irrational and that the "GAO deviated from the law applicable to FAR Part 8 procurements by evaluating the protest issues using FAR Part 15 principles and cases, and by disregarding the stated selection criteria as it applied to the evaluation of labor mix." Protestor also alleges that the GAO "erred in disregarding controlling law regarding an offeror's ability to rely on the corporate experience of its parent company," and also erred in "its evaluation of a data rights assumption" by "disregarding the agency's reasoned view that the assumption was immaterial because, to the extent there was any deviation, the order of precedence clause" in the GSA FSS BPA "'trumped' the assumption and rendered it meaningless."  Additionally, protestor alleges that the GAO "erred by finding that unequal treatment existed by citing non-prejudicial comparisons of two of the lowest rated vendors to PwC, who did not have a substantial chance for award even if their protests were sustained."

With regard to the first enumerated basis, that DHA unreasonably evaluated PwC's proposal under the corporate experience factor, it is not clear that the GAO was correct when it concluded that DHA did not reasonably explain why it credited PwC Public Sector with the experience of its parent entity, PwC US, because "PwC's quotation did not specifically explain or differentiate throughout its quotation as to whether particular resources or experiences related to PwC Public Sector as opposed to PwC US." See Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *5.  Protestor argues that "there should be no doubt that PwC was utilizing the resources of its parent" because the task order was being issued against a GSA FSS contract that had previously been novated from the parent entity, PwC US, to PwC Public Sector.  Protestor argues that the "transfer of resources and assets from the parent to PwC is the bedrock of a novation, which is why these resources [of PwC US] were appropriated evaluated by DHA." Protestor also asserts that there were "references in PwC's quote to reliance on the parent's resources" sufficiently "demonstrating reliance on the resources of [PwC's] parent company."  This court previously has held that an agency "may" attribute the experience or past performance of a parent or affiliated company, if the offeror merely, in the proposal or otherwise, demonstrates that the resources of the parent or affiliated company will affect, or play a role in, the performance of the offeror. See Femme Comp. Inc. v. United States, 83 Fed. Cl. 704, 747 (2008); see also Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 722 (2010).  "[A] contracting officer has discretion to take offerors at their word that the resources of their affiliates will be made available."  ARKRAY USA, Inc. v. United States, 118 Fed. Cl. 129, 136 (2014).

In both Volume I, "Technical Approach," and Volume II, "Management Approach," PwC stated that: "PwC Public Sector . . . receives substantial support from its parent.  For the purposes of the proposal, we will refer to PwC as inclusive of PwC US and PwC Public Sector."  PwC made several other references to its parent entity throughout its proposal, including in Volume II, "Management Approach": "PwC is a part of the global PwC network of firms, and we will use the firm's full capabilities, as well as the capabilities of our teaming partners, to address DHA's requirements for flexibility and adaptability."  In addition, the RFQ did not direct offerors to discuss at length or in detail each and every way their affiliates may be involved in contract performance.  The TEB stated in the technical evaluation report that PwC "provided clear evidence of superior, current, and relevant corporate experience." The technical evaluation report noted that "PWC has a very robust in-house corporate capability" and "[t]heir array of corporate and partner capabilities . . . are a superior offering of capabilities that align perfectly with the PWS requirements."

Although the GAO found that "the awardee's quotation did not specifically explain how PwC Public Sector would work with PwC US during the performance of the contract in a way that demonstrated that the experience of the latter should be credited to the former," the agency could, and did, consider the experience of PwC's parent entity based on the assertion of PwC in its quotation that the resources of the parent would affect the performance of the offeror and that PwC Public Sector "receives substantial support from its parent." See Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *5.  This court concludes that GAO may well have been in error regarding this ground for sustaining the protest. Even if the conclusion of the GAO on the role of PwC's parent company is incorrect, however, it is not the only grounds on which the GAO sustained the earlier protest brought before it, which led to DHA taking corrective action and issuing a revised RFQ also based on changed requirements.

In addition, protestor alleges that the GAO erred in concluding that PwC deviated from the data rights term when the agency reasonably found the term to be immaterial and the BPA's order of precedence clause rendered the deviation ineffective. Defendant-intervenors, and now defendant as well, argue that the GAO rationally determined that PwC's proposal took exception to the RFQ's data rights term, which rendered the proposal unacceptable, although defendant had previously accepted PwC's quotation with the data rights exceptions and awarded the original task order contract to PwC.

The RFQ issued on May 29, 2015 included the following data rights term:

**1.6.16. Data Rights:** The Government has unlimited rights to all documents/material produced under this contract. All documents and materials, to include the source codes of any software, produced under this contract shall be Government owned and are the property of the Government with all rights and privileges of ownership/copyright belonging exclusively to the Government. These documents and materials may not be used or sold by the contractor without written permission from the

Contracting Officer. All materials supplied to the Government shall be the sole property of the Government and may not be used for any other purpose. This right does not abrogate any other Government rights.

(emphasis in original). In its proposal to DHA, protestor submitted an offer that definitively attempted to limit the government's rights in the data and deliverables produced during contract performance:

[Redacted.] Unless required by the Act, neither the contract deliverables nor their content may be distributed to, discussed with, or otherwise disclosed to any Third Party without PwC's prior written consent. [Redacted.]

In contravention to the data rights term in the RFQ, that all of the rights to the data and deliverables produced during contract performance would be owned exclusively by the government, the PwC data rights term in its proposal took clear exception to the RFQ clause.

The Federal Circuit has stated that "'a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.'" Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996)); see also Centech Grp., Inc. v. United States, 554 F.3d at 1039 (holding that a proposal that did not offer to provide what the RFP requests was not responsive to the RFP). "'A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the [proposal].'" Transatlantic Lines, LLC v. United States, 122 Fed. Cl. 624, 632 (2015) (quoting Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 505 (2009)) (brackets in original). "Waiver of a mandatory requirement of the solicitation for the benefit of only one offeror invalidates a procurement decision." L-3 Commc'ns EO Tech., Inc. v. United States, 83 Fed. Cl. 643, 653 (2008). But, "[w]here a defect in a bid is trivial or a mere formality, not material, the bid is not required to be rejected out of hand." M.W. Kellogg Co./Siciliana Appalti Costruzioni S.p.A. v. United States, 10 Cl. Ct. 17, 26 (1986); see also E.W. Bliss Co. v. United States, 77 F.3d at 449.

The administrative record in the current protest indicates that PwC's proposal did not offer to provide the government with exclusive ownership of the data and deliverables produced during contract performance, as required by the RFQ. The language in the RFQ was crystal clear that the government would have "unlimited rights to all documents/materials produced under [the] contract," that all such documents "shall be Government owned and are the property of the Government with all rights and privileges of ownership/copyright belonging exclusively to the Government," and that the documents and material "may not be used or sold by the contractor without written permission from the contracting officer." Contrary to PwC's language in its quote, the RFQ did not provide that DHA would have to seek PwC's permission before distributing the contract deliverables to a third party. In arguing that the GAO decision was not rational, protestor

relies on the agency's assertion in its memorandum of law submitted to the GAO to defend against the GAO protest that the data rights term was not material and "that nothing in the RFQ even hinted that the order to PwC was heavily dependent on data rights.  In finding that the term was material, however, the GAO did not accept DHA's post-hoc position before the GAO[11] that the term was not material, but, instead, looked at the RFQ and found that the data rights term was a "clearly-stated requirement." Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *7.  Pointing to its prior decisions, the GAO explained that "clearly stated solicitation requirements are considered material to the needs of the government, and a quotation that fails to conform to material terms and conditions of the solicitation is unacceptable and cannot form the basis for award." Id. Because data rights and deliverables are generally considered valuable, especially if the contract is well performed, and the retention or transfer of data rights could have more than a negligible impact on the contract price, it was not unreasonable for the GAO to conclude that the data rights term was material.  After finding that PwC was not responsive to the RFQ when it tried to limit the government's "unlimited" data rights, which GAO read as a material requirement of the RFQ, and that the agency's evaluation and selection was flawed because DHA had accepted PwC's proposal with the data rights limitation, the GAO recommended that "[t]o the extent DHA believes that the data rights clause is not material, the agency should amend the RFQ, and request revised quotations." Id. at *15.

---

[11] In its decision, the GAO noted that "nothing in the contemporaneous record shows that the agency viewed [the data rights] clause as non-material, or otherwise demonstrates that the agency considers taking exception to the clause to be non-material." Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *7. Nor does this court have to accept the post-hoc position of the agency regarding what occurred at the agency prior to the contract award. As recently noted by another Judge of this court,

> the court is not inclined to credit the contracting officer's representations to the GAO, as they constitute post hoc rationalizations for the ATA's earlier decision. See CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 377 (2010) (remarking that there is no legal authority that "requires the court to give" a contracting officer's statement of facts submitted during a GAO bid protest "any independent, let alone dispositive, weight"); Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 508 (2003) ("The Supreme Court has made clear that post hoc rationalizations offered by the agency should be afforded limited importance in the court's analysis." (citing Citizens to Preserve Overton Park, 401 U.S. at 419, 91 S. Ct. 814)); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 339, 343–44 (1997) (noting that the court had "a choice about the degree of relevance to assign to" postdecisional documents included in an administrative record).

FFL Pro LLC v. United States, 124 Fed. Cl. 536, 556 n. 17 (2015).

Protestor also argues that the GAO's decision was not rational because it disregarded that the BPA, against which the task order was to be issued, contained a data rights term that complied with the RFQ and an order of precedence clause that rendered the data rights term in PwC's offer ineffective.  The protestor states, "the data rights assumption in PwC's quote was clearly and unambiguously negated by the order of precedence clause in the BPA."  In its decision, the GAO explained that this argument "fails because if a vendor takes exception to a material solicitation requirement, the agency may not merely ignore the exception by including the same solicitation requirement [that was included in the BPA] in the resulting contract."  Id. at *8.  In its opposition to protestor's motion, defendant asserts that protestor's arguments "fail to address whether DHA violated procurement law and regulations in making the award to PwC."  Defendant argues that "PwC's argument regarding the BPA terms attempts to defeat" the principle that "[a] proposal or quote that does not conform to the material requirements of the solicitation is unacceptable" by focusing on how the task order should be construed in the event of a future dispute between PwC and DHA with regard to data rights.  Defendant argues that how a future dispute between PwC and DHA would be resolved is a different issue than "whether PwC offered to provide the exact thing that the RFQ stated." This court concludes that the GAO's decision rationally focused on the intent and acceptability of PwC's proposal and not on a term in the BPA that would be applicable in a future dispute about the government's data rights. As defendant argued, at issue is whether PwC's proposal conformed to the material requirements of the RFQ and not whether the order of precedence clause in the BPA could "negate" PwC's exception to the data rights term.  A reasonable interpretation of the data rights clause in the RFQ supports the rationality of the GAO's conclusion that the data rights clause in the RFQ was a material term.  Regardless of the results of possible future disputes or litigation, the GAO properly determined that  acceptance of PwC's quote in the face of PwC's effort to limit the data rights clause was a legitimate ground to sustain the protest.  Accordingly, protestor is not likely to succeed in this protest in demonstrating that the GAO irrationally found that PwC's proposal had taken exception to a material term of the RFQ, and, as a result, was technically unacceptable.

Protestor also argues that the GAO should have dismissed or denied the data rights term protest ground because the vendor who raised it at the GAO protest, Deloitte, "was not prejudiced by the agency's evaluation of the data rights clause," and, as a result, Deloitte's protest should have been dismissed without reviewing the merits.   Protestor asserts that "[u]nder GAO's well-settled law, protestors who are not next in line for award are not interested parties to pursue their protest."  Protestor also argues that "[h]ad GAO properly applied its well-settled law, GAO should have dismissed Deloitte's protest for lack of interested party status and not even considered the merits."  In its decision, the GAO explained that it found no "reason to conclude that the agency's failure to address this area [the data rights term] in the evaluation was not a prejudicial error."  Id. at *8 n.8.  The GAO decided that "because we find that certain areas of the agency's evaluation were not reasonable, and because the record does not show how a proper evaluation would have affected the ranking of the vendors' proposals, we conclude that the protesters were prejudiced by the agency's evaluation." Id. at *15.

In this court, defendant-intervenor Deloitte argues that "[w]here, as here, an agency relaxes a solicitation requirement without amending the RFQ, it is appropriate for GAO to sustain a protest based on '***possible*** prejudice,' such as where the protester might have altered its quotation in response to the relaxed requirement." (citing CAN Industrial Eng'g, Inc., B-271034 at *3 (Comp. Gen. June 7, 1996)) (emphasis in original). Similarly, defendant-intervenor CALIBRE/EY argues that "[u]nder the precedent of the GAO and this Court, Deloitte, and all offerors, were prejudiced by the inability to compete against PwC on equal footing."  Defendant-intervenor Deloitte also argues that whether the GAO found that Deloitte was prejudiced is "irrelevant to the Court's inquiry here [at the Court of Federal Claims]."  Defendant-intervenor Deloitte points out that at least two Judges on this court have "previously held that [they] will not consider arguments regarding prejudice before GAO."   It is correct that in Navarro Research & Engineering Inc. v. United States, 106 Fed. Cl. 386, 417 (2012), and Jacobs Technology Inc. v. United States, 100 Fed. Cl. 186, 197 (2011), Judges of this court have held that whether the GAO properly found a protestor to be prejudiced is irrelevant to the rationality of the GAO's decision to sustain a protest.   As stated in Jacobs Technology Inc. v. United States, "[a]lthough prejudice is essential to a decision to sustain a bid protest, it has no bearing on GAO's determination of whether the agency violated a procurement statute or regulation, and the resulting recommendation." Jacobs Tech. Inc. v. United States, 100 Fed. Cl. at 197; see also Navarro Research & Eng'g, Inc. v. United States, 106 Fed. Cl. at 417 ([A]rguments based on whether the protestors were prejudiced by [agency's] alleged procurement errors are irrelevant to the rationality of GAO's decision to sustain [a protest].") (alterations added).  Accepting this line of cases, this court finds that the GAO's decision rationally explains that because the agency's evaluation contained defects, including the evaluation of PwC's data rights term and the additional errors discussed below, it could not be certain that the offerors' rankings would have been the same if the errors had not occurred, including Deloitte's designation as the lowest-ranked offeror.  The GAO reasoned that had DHA not relaxed the solicitation requirements, Deloitte might have been in a different position. See Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *15.  Accordingly, the GAO reasonably concluded that it could not determine Deloitte was not prejudiced, and, because GAO lacked a reliable method to ascertain how the offerors would have compared to each other had the agency not committed errors in the procurement, the GAO reasonably found that the protesters were prejudiced by the agency's evaluation and considered the merits of the protests grounds they advanced.

The GAO also determined that DHA's evaluation of PwC's proposed labor mix was unreasonable because, in determining whether PwC's proposed labor mix was appropriate, the administrative record indicated that DHA focused "exclusively" and "solely" on key personnel labor categories and did not consider PwC's entire labor mix. The RFQ explained that the "contracting officer will award a BPA call to the contractor submitting the highest rated quote proposing an appropriate mix of labor for the required level of effort at a fair and reasonable price."  Additionally, the RFQ explained that DHA was "seeking the best level of effort and labor mix" that the offerors deemed necessary to accomplish the objectives contained in the PWS. The RFQ included sample, but not

mandatory, labor categories for offerors to include in their proposed labor mixes, which included categories for key and non-key personnel. The RFQ also listed the key personnel, which included, program manager, organizational development subject matter expert, deputy program manager for business process reengineering, primary and specialty care subject matter expert, patient safety and healthcare quality subject matter expert, and a deputy program manager for analytics. As part of the evaluation of the offerors' proposed management approach, offerors were to be evaluated on their approach to key personnel and staffing.

In this court, protestor alleges that the GAO's determination was irrational because it imposed unwarranted, heightened documentation requirements and "ignored evidence in the record reflecting that the evaluation was consistent with the RFQ." Protestor argues that only minimal documentation was required because the procurement was conducted pursuant to FAR subpart 8, which provides only that the "ordering activity shall document evidence of compliance" with the procedures in FAR subpart 8.405(c) and "the basis for the award decision." 48 C.F.R. § 8.405-3(c)(iii)(B). Protestor also states that "GAO disregarded that this procurement was an FSS buy with limited documentation requirements and erroneously imposed heightened documentation requirements" on the procurement.

The applicable regulation here, FAR subpart 8.405-3, instructs that, when an agency is placing an order against a BPA established under a GSA FSS, the agency shall "[f]airly consider all responses received and make award in accordance with the selection procedures." 48 C.F.R. § 8.405-3(c)(iii)(A)(3). The FAR also states that the "ordering activity shall document . . . the basis for the award decision." 48 C.F.R. § 8.405-3(c)(iii)(B). "[O]ne reason for overturning an agency award decision is that the agency's evaluation of proposals was done in a manner inconsistent with the evaluation criteria discussed in a solicitation." HWA, Inc. v. United States, 78 Fed. Cl. 685, 704 (2007). The GAO will "examine the record to ensure that the evaluation was reasonable, in accordance with stated evaluation criteria, and not in violation of procurement laws and regulations." United Enter. & Assocs. v. United States, 70 Fed. Cl. 1, 26 (2006) (quoting PEMCO World Air Servs., B-284240.3, B-284240.4, B-284240.5, 2000 WL 546803, at *9 (Comp. Gen. Mar. 27, 2000)). While agencies have broad discretion when evaluating bids, "the agency's technical evaluation must be consistent with the factors and procedures outlined in the solicitation." Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 650 (2014). FAR subpart 8.4 provides for streamlined and minimal documentation, however, "[a]n agency must articulate a satisfactory explanation for an action to permit effective judicial review." Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. at 653. "Specifically, the agency must articulate the reasons for its procurement decision including a rational connection between the facts found and the choice made." Id.; see also Distrib. Sols., Inc. v. United States, 106 Fed. Cl. 368, 377 (2012). Citing previous Comptroller General decisions that involved procurements pursuant to FAR subpart 8.4, the GAO explained in its decision that when "an agency issues an RFQ to FSS contractors under FAR subpart 8.4 and conducts a competition, we will review the record to ensure that the agency's evaluation is reasonable and consistent with the terms of the solicitation." Deloitte Consulting, LLP; Booz Allen

Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *4 (citing GC Servs. Ltd. P'ship, B-298102 (Comp. Gen. June 14, 2006); RVJ Int'l, Inc., B-292161 (Comp. Gen. July 2, 2003)).

As noted above, protestor alleges that the GAO's decision on the issue of PwC's proposed labor mix was irrational because it inappropriately imposed heightened documentation requirements, that the GAO "ignored that FAR Part 8 competitions require minimal documentation," and that the documentation requirements for FAR subpart 8 procurements are less stringent than FAR subpart 15 procurements.  This argument is based on the language in FAR subpart 8.405-3, which requires that the agency document the basis for the award decision. See 48 C.F.R. § 8.405-3(c)(iii)(B).

The GAO's decision regarding DHA's evaluation of PwC's proposed labor mix, however, did not rest on the failure to document in accordance with the FAR. See Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *10. Instead, the GAO decision addressed the requirement that the agency must make award "in accordance with the selection procedures."  48 C.F.R. § 8.405-3(c)(iii)(A)(3); see also Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *10. Of note, the record before the court demonstrates that the RFQ selection procedures required DHA to consider whether the offerors had proposed appropriate labor mixes, therefore, the issue is whether DHA followed the evaluation requirements in the RFQ. According to the RFQ, quotes "were to be rated from highest to lowest based upon technical approach to include corporate experience and corporate capability, and management approach to include program management and key personnel and staffing."  The RFQ also stated: "The contracting officer will award a BPA call to the contractor submitting the highest rated quote proposing an appropriate mix of labor for the required level of effort at a fair and reasonable price." To make this evaluation determination in accordance with the RFQ, DHA would have had to consider the mix of labor categories and hours proposed by each offeror, including key and non-key personnel labor categories, but the depth of the necessary inquiry is not found in the RFQ.

The technical evaluation report and the price analysis report indicates that the TEB did address PwC's proposed labor mix, albeit somewhat briefly.  The administrative record before the GAO and this court contains the technical evaluation report, which includes the TEB's consideration of PwC's labor mix, and the price analysis report. The price analysis report explains that "[t]he TEB reviewed the labor mix and hours which establish that PWC's technical and management approach are more than adequate." Moreover, the price analysis report states that "PWC's mix and balance of projected labor hours, education, training, and experience of the proposed labor mix is competitive." In the technical evaluation report, the technical evaluator stated, specifically addressing PwC's approach to supporting a comprehensive military campaign plan for HRO transformation, that "PWC offers the best mix of key personnel and a full team to support the MHS in this effort. . . ." In evaluating PwC's proposed "Management Approach," to include "program management, key personnel and staffing," the technical evaluation report stated that, "[w]hat is most notable in PWC's management approach is their

appropriate mix and balance of projected labor hours, education, training, and experience of the proposed team members. . . ."  Additionally, the technical evaluator explained:

> In reviewing for an appropriate mix of labor, the government notes a key advantage[12] in that out of the [redacted] key personnel offered, they total to about [redacted] FTEs worth of work, [redacted] ratio. [Redacted.]

Although the technical evaluation report discussed PwC's proposed labor mix, the award decision document did not discuss whether PwC proposed an appropriate mix of labor.[13]

As noted above, the issue is whether, given the RFQ selection procedures and the examples from the administrative record that demonstrate DHA's contemporaneous consideration of PwC's proposed labor mix, DHA's review of PwC's proposed labor mix supported the selection of PwC as the contract awardee.  In addition, during the protest at the GAO, the TEB submitted a declaration explaining that it had "evaluated PWC's labor mix by converting the proposed hours of each labor category, including both key and non-key personnel, to approximate FTEs . . . and evaluating the proposed labor category mix."  This court believes it may consider agency submissions to the GAO, but such materials are not automatically accepted at face value. See Vanguard Recovery Assistance v. United States, 99 Fed. Cl. 81, 102 (2011); see e.g., Holloway & Co., PLLC v. United States, 87 Fed. Cl. 381, 391-92 (2009); PGBA, LLC v. United States, 60 Fed. Cl. 196, 204 (2004).  "This court must critically examine any post hoc rationalization by the agency, including declarations, affidavits, or live testimony submitted to the GAO during a bid protest.  See PGBA, LLC v. United States, 60 Fed. Cl. at 20; but see Vanguard Recovery Assistance v. United States, 99 Fed. Cl. at 102 ("Post hoc declarations and arguments will be discounted or disregarded.").

It is a somewhat close call as to whether or not the contemporaneous record supports the assertions of the TEB in its declaration to the GAO.  Although the agency's selection document does not reference specific evaluation of PwC's labor mix, the technical evaluation report, which is part of the administrative record, does contain references to such evaluation activity.  Therefore, without the TEB's declaration to the GAO, the record before the court is unclear as to the depth of the agency's review of PwC's labor mix, although it is clear that some review of PwC's proposed labor mix likely took place.  Therefore, it is not clearly established whether the GAO was in error in finding this issue to be a valid protest ground.

Protestor further argues that, "even if GAO were correct that the agency did not sufficiently evaluate PwC's labor mix . . .  none of the protestors were prejudiced since

---

[12] The parties dispute whether DHA's finding that PwC's proposal presented a "key advantage" was reasonable.  The GAO found that DHA's concessions during the GAO bid protest undercut the agency's finding of a "key advantage." Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *10.

[13] The award decision did mention that Booz Allen proposed an appropriate mix of labor.

the correction for that was dictated by the RFQ."  The selection procedures in the RFQ explained that:

> The contracting officer will award a BPA call to the contractor submitting the highest rated quote proposing an appropriate mix of labor for the required level of effort at a fair and reasonable price. If the contractor submitting the highest rated quote does not propose an appropriate mix of labor for the required effort at a fair and reasonable price, the contracting officer may obtain additional information from, and negotiate with, that contractor to improve the terms of the deal reflected in its quote.

Although protestor argues that the "'fix' for any of the labor mix errors identified by GAO was to negotiate only with PwC," the error that the GAO identified was that DHA did not properly evaluate DHA's proposed labor mix, not that further negotiation was needed.

The GAO also sustained the bid protest on the grounds that "certain areas of the evaluation reflect unequal treatment" of Booz Allen and Deloitte. See Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *11-12.  Protestor, however, argues that the GAO's determination that the record reflected unequal treatment towards Booz Allen and Deloitte was irrational.  As the GAO explained, "[i]t is fundamental that a contracting agency must treat all offerors equally and evaluate offers evenhandedly against common requirements and evaluation criteria."  See id. at *11. "Under FAR subpart 8, an agency also must treat all offerors equally and evaluate quotations evenhandedly against all common requirements."  Id.  A contracting officer must "[f]airly consider" all quotes received in response to an RFQ for a BPA call order. 48 C.F.R. § 8.405-3(c)(2)(iii)(A)(3).  In a FAR subpart 8 procurement, an agency must ensure that "'all quotes are fairly considered'" "on an equal basis." Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. at 652 (quoting 48 C.F.R. § 8.405-3(b)(2)(vi)).

With regard to Booz Allen, the GAO found indications of unequal treatment in two areas. See Deloitte Consulting, LLP; Booz Allen Hamilton, Inc.; CALIBRE Sys. Inc., B-411884.6, 2015 WL 9701026, at *11-12. First, the technical evaluator positively assessed PwC's quotation based on the evaluator's calculations that indicated PwC's program manager was committed to directly supporting contract performance for close to [redacted] full time equivalent (FTE).[14]  See id. at 11. The GAO found that the technical evaluator did not, however, conduct the same calculations and analysis for Booz Allen's quote, even though Booz Allen's quote provided all of the information necessary to conduct such an analysis.  See id. As a result, PwC received credit from DHA for committing the program manager for [redacted] FTE, but DHA did not credit Booz Allen

---

[14] The TEB concluded that the hours proposed for PwC's program manager indicated the program manager would work close to [redacted] of the same number of hours that a full time employee would work. The TEB explained that it divided the hours PwC proposed for the program manager and senior functional consultant positions by the estimated number of full time equivalent hours the government expected would be needed for contract performance in order to determine how many hours PwC proposed for its program manager and senior functional consultant.

for committing its program manager for [redacted] FTE. See id.  Additionally, the GAO found that DHA did "not reasonably explain the basis" for concluding that Booz Allen's organizational development subject matter expert did not meet all the solicitation requirements.  See id. at *12. During the protest at the GAO, Deloitte also had argued that DHA's evaluation was unequal and unreasonable because "the agency gave specific credit to PwC based on the experience of its team members" but did not give credit to Deloitte for its team's familiarity and involvement with the MHS Review and HRO Task Force. See id.  Deloitte also argued at the GAO that "DHA gave credit to PwC based on the strength of its client list," but did not give Deloitte credit for its similar list of [redacted] clients, which included [redacted] of the [redacted] clients on PwC's list. See id. The GAO agreed and decided "that DHA's evaluation of Booz Allen's and Deloitte's quotations was unequal as compared to the evaluation of PwC's quotation." See id.

Protestor argues that the instances of unequal treatment towards Booz Allen and Deloitte that the GAO discussed in its decision are refuted by the record, and, even if true, are isolated instances that were not prejudicial to Booz Allen or Deloitte.  Defendant-intervenor Booz Allen argues that PwC's assertion that the instances of unequal treatment were isolated "unreasonably relies on the very evaluation findings challenged by the protestors and found unreasonable by GAO" and that there is "no support for PwC's allegations that the disparate treatment instances were isolated."

With regard to Booz Allen's program manager, PwC argues that its program manager met all of the required and preferred qualifications, whereas Booz Allen's "met [redacted] of the preferred qualifications," therefore, Booz Allen's proposed [redacted] FTE program manager was not a benefit that would have affected Booz Allen's ranking, even if the TEB had calculated the total FTEs that Booz Allen proposed for its program manager, as it did for PwC. Defendant argues that the GAO reasonably concluded that it was "unclear" why the technical evaluator could not have conducted the same analysis of Booz Allen's program manager as it did for PwC's.  Defendant also argues that the GAO reasonably concluded that Booz Allen was treated unequally because PwC received credit for the [redacted] FTE commitment of its program manager key personnel, but Booz Allen did not receive credit for the [redacted] FTE commitment of its program manager key personnel.  According to the TEB's declaration submitted to the GAO, the program manager was one of the "most critical key personnel." The GAO reasonably found that Booz Allen did not receive equal treatment with regard to the program manager because there is no dispute that DHA did not conduct the same calculations for Booz Allen's program manager as it did for PwC's program manager.  The TEB explained that it "was not able to determine the total FTEs that [Booz Allen's] key personnel would serve, so therefore this comparator was not addressed between PwC and [Booz Allen]."  DHA does not appear to have considered the FTE commitment of Booz Allen's program manager, so it remains unclear whether Booz Allen would, or should, have received credit for the commitment of its program manager and whether that credit would have affected Booz Allen's ranking.  Given the importance assigned to the program manager as one of the "most critical key personnel," it seems likely that Booz Allen's ranking could have been affected by the TEB's calculation of its FTE(s) for the program manager labor category.

Protestor also disputes the GAO's finding that Booz Allen received unequal treatment in the evaluation of its [redacted].  The RFQ issued on May 29, 2015 required offerors to include key personnel in their quotes, including an [redacted] who was required to have a [redacted.]  According to the TEB's declaration submitted to the GAO, this [redacted] was one of the "most critical key personnel."  Booz Allen's quote included an [redacted] who had [redacted].  PwC's quote proposed an [redacted] who had [redacted].  Neither quote included [redacted] with [redacted].  Yet, in the award decision memorandum, the source selection official stated that "PWC's Management approach was clear, compelling and convincing and their offer of key personnel either met or far exceeded all of the government's articulated requirements."[15]  During the protest at the GAO, DHA argued that "even if the assessment [of Booz Allen's proposed [redacted]] was erroneous, it was not prejudicial" because it was not a discriminator in the award decision.  The GAO, however, sustained the protest because DHA did not reasonably explain the basis for concluding that the erroneous evaluation of Booz Allen's proposed [redacted] was not prejudicial.  The record demonstrates that PwC and Booz Allen were treated differently with regard to the [redacted] they proposed, who had similar credentials, and the source selection official noted PwC's qualified key personnel in the award decision.  Accordingly, the GAO's decision that Booz Allen's quote was treated unequally was reasonable.

During the GAO protest, Deloitte argued that its quote received unequal treatment as compared to PwC and the GAO agreed.  Protestor argues that the GAO decision was unreasonable because "it was the lack of [Deloitte's] articulated approach that drove the agency's conclusion, not unequal treatment."  Defendant-intervenor Deloitte argues that "both Deloitte and PwC proposed team members with extensive relevant experience," but "DHA downgraded Deloitte's quotation" because Deloitte relied on its team and team members' familiarity and involvement with the MHS Review and the HRO Task Force.  In the above-captioned protest, defendant-intervenor Deloitte contends that the "GAO reasonably found that DHA's actions constitute unequal treatment" because, "[w]hile Deloitte's reliance on its team members was seen as a weakness[,] the very same aspect of PwC's quotation was evaluated as a strength."  The technical evaluation report for PwC stated: "A corporation and management team that is intimately familiar with this improvement effort is sure to bring the right perspective and approach to the MHS' [sic] quality improvement effort."  The technical evaluation report further stated that "PWC currently supports the MHS Governance Integration Office and has deep and thorough knowledge of the functions and challenges of the current MHS Governance Construct."  Additionally, the technical evaluation report explained that the "government also has high confidence that PWC's deep technical depth of their proposed team and their relevant

---

[15] In the TEB's declaration submitted to the GAO explaining why PwC's quote was superior to Booz Allen's quote, it indicated that "neither PWC nor [Booz Allen] completely met the required qualifications of the OD SME [organizational development subject matter expert] . . . PWC included [redacted.]  This acknowledgment by the TEB, however, came during the GAO protest, therefore it was after the contract was awarded to PwC and was not reflected in the award decision document, which had concluded that PwC's key personnel either met or exceeded the RFQ requirements.

experience and capabilities will allow them to fully support the Government's requirements." The technical evaluation report stated, with regard to Deloitte, that "they primarily relied on their team and team member's [sic] familiarity and involvement with the MHS Review and HRO Task Force to date.  While this is an advantage for them, this intimate knowledge did not result in any distinct advantage in being able to articulate a clear technical approach. . . ." As these excerpts from the technical evaluation report reflect, PwC's "intimate" familiarity with the "improvement effort" was "sure to bring the right perspective and approach" and DHA had "high confidence" that PwC's relevant experience would allow it to "fully support" DHA's requirements, and, yet, this same positive assumption was not given to Deloitte's "intimate knowledge" with the MHS Review and HRO Task Force.  It appears unequal that DHA made a positive assumption about PwC's familiarity with the effort to transform the MHS to an HRO and did not make the same positive assumption about Deloitte, or any other entity, that also had familiarity and experience with the MHS Review and HRO Task Force, which are apparently integral to the improvement effort and the transformation to an HRO.  The court agrees that the GAO's determination that Deloitte's quote received unequal treatment with regard to the experience of its team members was reasonable because the technical evaluation report made a positive assumption about the value of PwC's experiences but did not make the same positive assumption about Deloitte's experiences, and DHA did not provide a sufficient explanation or basis for that distinction.

Additionally, defendant-intervenor Deloitte argued during the GAO protest that it was treated unequally because DHA did not give its quote credit for the client list included in its quote, but, as the record indicates, DHA did give PwC credit for the list of [redacted] clients in PwC's quote. The technical evaluation report stated that:

[redacted.]

Defendant-intervenor Deloitte argues that, although DHA gave PwC credit for its client list, "DHA ignored the fact that Deloitte's quotation identified a roster of [redacted] clients," and the "GAO reasonably found that this constituted an example of unequal treatment." In contending that the GAO's decision was unreasonable, protestor argues that "Deloitte only had [redacted] of the same [redacted] clients [on PwC's list], so it is unclear why GAO believes this warrants similar consideration or evidences unequal treatment."  The technical evaluation report indicates that PwC was given credit because PwC listed [redacted] clients which were studied by the HRO Task Force.  Attached to protestor's complaint, as exhibit 14, is the HRO Task Force Report, which was prepared by the HRO Task Force after the MHS Review.  In appendix C to the HRO Task Force Report is a list of entities associated with "Leading Practices in High Reliability Organizations." This list includes: Memorial Hermann Healthcare System, Kaiser Permanente, Cincinnati Children's Hospital Medical Center, and, among others, the Center for Medicare and Medicaid Services.  Similarly, in appendix F to the report, is a list of entities associated with "Leading Practices in Continuous Process Improvement," including: Kaiser Permanente, Cincinnati Children's Hospital Medical Center, and Memorial Hermann. Both appendices to the HRO Task Force report indicate these entities were sources of study or reference for the HRO Task Force.  [Redacted] of these entities listed above are

included as clients in Deloitte's quote. The technical evaluation report, however, did not credit Deloitte's quote for including these [redacted] clients in the same way that it gave credit to PwC for listing [redacted] clients in its quote that were studied by the HRO Task Force. Because the administrative record reflects that Deloitte may not have been given the same positive assessment based on its client list as PwC was given, even though Deloitte and PwC each listed [redacted] and [redacted] clients respectively that were studied by the HRO Task Force, the GAO's conclusion cannot be found irrational when it decided that DHA's evaluation of Deloitte's quote was unequal compared to DHA's evaluation of PwC's quote.

For each of the instances in which the GAO found unequal treatment between PwC and Booz Allen or Deloitte, protestor argues that these "narrow instances of GAO's concern" are not prejudicial and outweighed by the "myriad of other discriminators" that established the superiority of PwC's proposal over Booz Allen and Deloitte. As discussed above, however, "arguments based on whether the protestors were prejudiced by [agency's] alleged procurement errors are irrelevant to the rationality of GAO's decision to sustain [a protest]." Navarro Research & Eng'g, Inc. v. United States, 106 Fed. Cl. at 417 (alterations added).  In sum, the GAO's conclusion to sustain the protest on one or more grounds was reasonable, rational, and provided a valid basis on which the agency could act to follow the GAO's recommendation to take corrective action.

In addition to arguing that the GAO's recommendation was irrational and, thus, cannot support the agency's corrective action decision, protestor also argues that DHA's corrective action independently was arbitrary and capricious because it was "overbroad, unrelated to the bases of sustain in GAO's decision, does not reflect any change in agency needs, and unfairly favors PwC's competitors." Quoting Amazon Web Services, Inc. v. United States, 113 Fed. Cl. 102, 115 (2013), protestor argues that "[e]ven where a protest is justified, any corrective action 'must narrowly target the defects it is intended to remedy.'"  Protestor asserts that none of the issues identified in the GAO's decision "required the agency to dramatically revise the solicitation and resolicit quotes, essentially starting the competition over."   Instead, protestor argues, "[w]hen flaws have occurred during the evaluation of properly submitted proposals, this Court has found that reevaluation may be appropriate, but resolicitation is not. . . ."   To support its assertion that the agency's needs have not changed, which contradicts what has been suggested to this court by DHA, protestor points to the evaluation criteria as the area in which "substantive and dramatic changes" were made to the RFQ.  Protestor contends that a proper, narrowly tailored approach would have included reevaluation, not resolicitation of proposals. Protestor states:

> To remedy the GAO's identified bases of sustain, all the agency needed to do was reevaluate corporate experience to document its understanding of PwC's quote, reevaluate data rights to document its understanding that the BPA trumped the order (and possibly seek clarification from PwC), reevaluate labor mix to better document the record, and reevaluate the isolated instances of unequal treatment.

Protestor asserts that the "only basis of sustain that *might* require the agency to seek information from PwC (or if the agency chooses, other vendors) involved data rights" and that "it is possible that the agency could limit its communications solely to PwC." (emphasis in original).  Protestor also relies on <u>Amazon Web Services, Inc. v. United States</u>, 113 Fed. Cl. at 115, to argue that resolicitation is not appropriate because it "'compromises the integrity of the procurement system, especially where the winning price has been disclosed.'" That case, however, is distinguishable from the above-captioned protest for two reasons. First, the agency in <u>Amazon Web Services, Inc. v. United States</u> decided to take corrective action to implement a GAO recommendation, which the court determined was irrational, thus rending the agency's corrective action unreasonable.  See <u>id.</u> at 116.  In the instant protest, one or more of the GAO's grounds for sustaining the protest is considered by this court to be reasonable and proper. Second, in <u>Amazon Web Services, Inc. v. United States</u>, the GAO's recommendation to resolicit proposals was irrational because the procurement defects that the GAO discovered only related to the agency's evaluation of proposals and did not suggest issues with the solicitation itself. See <u>id.</u>  In the instant protest, the GAO indicated there was at least one issue in the RFQ regarding the data rights term and recommended that DHA review the term and revise the RFQ accordingly. Moreover, the court in <u>Amazon Web Services, Inc. v. United States</u>, also does not discuss the impact that any changes in the agency's needs, or an agency's decision to amend its evaluation criteria to better match its needs, would have on the review of an agency's corrective action.

In opposing protestor's motion for a temporary restraining order and/or a preliminary injunction, defendant argues that there "is no requirement that DHA's corrective action be 'narrowly tailored' and restricted to reevaluation of earlier quotations" because the "'narrowly tailored' criterion is not uniformly applied in the review of corrective actions."  Defendant and defendant-intervenors argue that protestor's reliance on the "narrowly tailored" approach is misplaced and has been rejected in other decisions of the court, specifically <u>Sierra Nevada Corp. v. United States</u>, 107 Fed. Cl. 735, 750-51 (2012). Defendant and defendant-intervenors assert that the appropriate standard of review for a challenge to an agency's corrective action is whether the corrective action is "reasonable under the circumstances." (citing <u>Sierra Nevada Corp. v. United States</u>, 107 Fed. Cl. at 750-51).

After the GAO decision was issued, DHA submits that the solicitation was revised in response to the GAO's recommendation and to address what the agency described as changed requirements that had developed since the original RFQ was released on May 29, 2015, resulting in changes to the PWS and the evaluation criteria in the revised RFQ. The administrative record and declarations submitted by DHA indicate that DHA's decision to amend the solicitation, including eliminating certain requirements that were included in the previous RFQ, was the result of an overall review of the agency's requirements and the RFQ after the GAO issued its recommendation to DHA to take corrective action. The government is authorized to amend a solicitation based upon an exercise of discretion.  See <u>ManTech Telecomms. & Info. Sys. Corp. v. United States</u>, 49 Fed. Cl. at 73. "[I]n a negotiated procurement, the contracting agency has broad discretion to amend the solicitation when it determines that such action is necessary to ensure fair

and impartial competition and to permit the government to obtain its minimum requirements at the most favorable price." Id.  In fact, an agency must amend a solicitation for goods or services when the agency changes its requirements or terms and conditions. See 48 C.F.R. § 15.206(a); see also COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012). "[A]s a policy matter, the Government should not be forced to accept service contracts that understate its needs even if the understatement was the Government's fault. The primacy of the procuring agency's assessment of its own needs and the penalty to the fisc transcend the harm to the frustrated bidder in losing the prospective contract." Vanguard Sec. Inc. v. United States, 20 Cl. Ct. 90, 109 (1990).  "An agency's determination of the 'best method of accommodating' its needs also falls within the agency's discretion."  See CHE Consulting, Inc. v. United States, 74 Fed. Cl. 742, 747 (2006) (quoting United Enter. & Assocs. v. United States, 70 Fed. Cl. 1, 26 (2006)). Other than issuing the amendments to the RFQ, once again, DHA did not carefully contemporaneously document its decision to take specific corrective action or to make amendments to the RFQ.  The declarations of the contracting officer and the Government Lead for the MHS Review Project Management Office submitted to this court, however, describe what the agency considered to be changed requirements between the issuance of the original RFQ and the revised RFQ following the GAO decision, and support defendant's position that DHA acted reasonably, and within its discretion, when it reviewed and amended the RFQ.

Protestor alleges, without evidence, that "the agency's needs have not changed." Protestor argues that "[i]n fact, the PWS is substantially unchanged except for minor edits." In her declaration submitted to court, however, the contracting officer stated that "the program office revised the PWS to . . . take into account changes in the Agency's requirements, in part because quite a bit of time had passed since the Agency originally issued the solicitation." Also, the Government Lead for the MHS Review Project Management Office states in her declaration that changes were made to the PWS based on changes in the agency's requirements.  The contracting officer explained that the agency reviewed the evaluation criteria to ensure that it is designed to "result in the best solution for the Agency and to more fully communicate the basis on which quotes will be evaluated."  The contracting officer explains in a declaration to this court that

> we revised the evaluation to indicate that, instead of evaluating the offerors' proposed approaches for completing all PWS tasks, the Agency would evaluate the offerors' proposed approaches to four specified areas.  This will help ensure that the Agency obtains what it really needs by allowing us to better distinguish between the merits of the quotes and to make award to the vendor most likely to not only successfully, but also exceptionally, meet the requirement.

Additionally, as part of an

> overall review of the evaluation approach, the program team (none of whom were involved in the previous evaluation of quotes) decided that evaluating corporate capability/experience and military campaign planning as in the

original procurement would not help the Agency identify the best quote or differentiate between quotes. Instead, the team decided to focus the evaluation on the vendors' specific experience performing prior similar tasks.

In opposing protestor's arguments, defendant asserts that "PwC's attack on the revised evaluation criteria is without merit. [citations in original omitted] DHA possesses ample discretion to select evaluation criteria, and PwC fails to demonstrate a clear violation of procurement statutes or regulations." Defendant asserts that the "revised PWS clarifies and updates DHA's requirements by detailing progress made on action plans, including identifying plans already completed and not part of the revised PWS." The Government Lead for the MHS Review Project Management Office listed the following changes to the PWS:

a) 5.6.2. Support Action Plans #28 and #38 – Data mining and analytic support for infection prevention was removed as it will be performed by an existing analytic cell.

b) 5.6.3. Support Action Plans #32 and #33 – The Patient Education Work Group, a work group comprised of military and civilian subject matter experts in patient safety, quality, and process improvement, among others, identified patient safety, quality and process improvement training requirements for target audiences and MHS resources for this training. They also completed development of an executive leadership toolkit in December 2016. These tasks were replaced in the PWS with the development of an implementation plan to build workforce capability in patient safety, quality and process improvement; a nd an evaluation plan to assess effectiveness.

c) 5.7. Support Action Plans #20, #21 and #22 – Data analyst support to design a demonstration project both for the future TRICARE managed care support contracts (T-2017) and the current T-3 contracts, which will expire when the T-2017 contracts take effect, is no longer needed as design is nearly complete. However data analyst support for implementation and interpreting the results of the demonstration project is still needed. The contracts are the mechanism used to provide private sector (purchased) care to TRICARE beneficiaries within the 50 states and D.C. They will expire when the T-2017 contracts take effect, at some point in 2017.

d) 5.11. Support to Action Plans #6, #9 and #26 – The perinatal section was rewritten and reorganized for clarity. The new PWS also adds specificity that support will include implementation and evaluation of education/training programs at the 50 military treatment facilities with obstetrical services. The number of hospitals which require implementation and evaluation of education/training programs was not clearly stated in the original PWS.

e) Section 5.12 in the original PWS was removed as it pertained to support for the deployment of Essentris® 2.0, updated modules for the inpatient electronic medical record, and other changes to the medical record. This support is no longer required as deployment of Essentris®, 2.0 will be completed in January 2016. The Essentris® program office, a government entity in the Defense Health Agency, in conjunction with CliniComp, the company that owns Essentris®, are responsible for deployment of Essentris® 2.0.

These statements seem to indicate that the agency's needs have evolved from the first RFQ, which was issued on May 29, 2015, to the revised RFQ, which was re-issued on December 21, 2015, a nearly 7-month period, and that DHA has reasonably explained its decision to amend the RFQ.  As noted above, DHA explained in its submission to the court that various requirements in the prior RFQ have been performed, or are in progress, and, therefore, were removed in the revised RFQ to better reflect DHA's current needs, including support for the development of an executive leadership toolkit by the Patient Education Work Group, data analyst support to design a demonstration project for the future TRICARE manager care support contracts and the current T-3 contracts, and support for the deployment of Essentris® 2.0. As these requirements have been satisfied, DHA no longer needs to solicit quotes that address these requirements.  Additionally, DHA removed the military campaign planning evaluation factor because the assessment of that factor "would not help the Agency identify the best quote."  The record reflects that, after the GAO's decision, the agency exercised its broad discretion to determine its current needs and, subsequently, amended the solicitation in order to ensure that DHA would be able to properly evaluate proposals to obtain its minimum, changed requirements. See ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. at 73.  The determination of an agency's needs is not one that this court will second guess. See Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1285–86; see also CHE Consulting, Inc. v. United States, 74 Fed. Cl. at 747.  Because the agency's needs appear to have progressed and changed over time, protestor's argument that DHA could communicate only with PwC to resolve PwC's nonconforming data rights term fails because new proposals from all eligible offerors should be sought in response to the newly revised solicitation.  Indeed, it would be incorrect for this court to prevent DHA from resoliciting new quotes based on a revised RFQ in order to meet its current needs, and DHA has sufficiently explained that real and substantive changes with the agency's requirements necessitate resoliciting quotes based on a revised RFQ.  Accordingly, given the agency's broad discretion to determine its needs and amend a RFQ to reflect changed requirements, it is unlikely that protestor will be able to successfully establish that the agency's corrective action decision was arbitrary and capricious.

Finally, as discussed above, in its motion for a temporary restraining order and/or a preliminary injunction, protestor asserts that all of the defendant-intervenors should be disqualified from competing for the task order contract "due to significant organizational conflicts of interest," and that this court should "declare this RFQ to be an unreasonable response to the GAO's decision because, among other reasons, the new RFQ is creating significant actual or potential OCIs where none before existed." Protestor asserts that the

agency "has abandoned its duty to ensure fairness in the competition" by adequately considering, and then avoiding, neutralizing, or mitigating significant OCIs.  Defendant argues that, "[a]t this time, no determinations as to the existence of potential OCIs, or who may be awarded the new contract have been made nor have the rights of PwC or other vendors been determined."  Defendant and defendant-intervenors argue that protestor's OCI allegations are premature and not ripe for judicial review because the agency has not considered OCI mitigation plans for all offerors under the revised RFQ, nor has it made a final decision regarding any alleged OCIs.  Despite protestor's argument that it is not "contending that this Court supplant the Agency's obligation" to investigate any possible OCIs, protestor is, in fact, asking this court to find, at this time, that OCIs exist under the revised RFQ, so as to render the revised RFQ per se unreasonable.  FAR subpart 9.5 places the responsibility for investigating OCIs squarely with the contracting officer.  See 48 C.F.R. § 9.500 (2016); see also PAI Corp. v. United States, 614 F.3d at 1352 ("The contracting officer does have considerable discretion in determining whether a conflict is significant.  Moreover, the FAR provides a contracting officer with considerable discretion to conduct fact-specific inquiries of acquisition proposals to identify potential conflicts. . . ."); Axiom Resource Mgmt., Inc. v. United States, 564 F.3d at 1382 (explaining that "the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion" by the contracting officer).  Notwithstanding protestor's argument to the contrary, a finding by this court that OCIs exist with regard to the revised RFQ would require the court to supplant the agency's ongoing OCI review responsibility and decision-making process, without knowing anything about which offerors will submit quotes to the revised RFQ or sufficient, individual mitigation plans.  Protestor's OCI allegations are not ripe for review.

Therefore, having decided that protestor is not likely to succeed on the merits of the underlying bid protest because at least one, if not more, of the grounds on which the GAO sustained the earlier protest were reasonable and provided a basis on which the agency could initiate corrective action, and because the agency has broad discretion to amend a solicitation to reflect changed requirements, this court need not consider other factors pertinent to issuing a temporary restraining order and/or preliminary injunction, including whether irreparable harm is likely if the injunction is not granted, the balance of hardships as between the litigants, or the public interest.  See CBY Design Builders v. United States, 105 Fed. Cl. at 328.  The record in this bid protest does not support the issuance of a temporary restraining order and/or a preliminary injunction, or, for that matter, a permanent injunction, which will be addressed in a separate, future order.

## CONCLUSION

Based on the above discussion, defendant-intervenor CALIBRE/EY's motion to dismiss for lack of subject matter jurisdiction is **DENIED**, defendant's cross-motion to

dismiss PwC's OCI allegations is **GRANTED**, and PwC's motion for a temporary restraining order and/or a preliminary injunction and declaratory relief is **DENIED**.

      **IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**
